## INTERSTATE NATURAL GAS CO., Inc. v. LOUISIANA PUBLIC SERVICE COMMISSION et al.

### No. 38.

District Court, E. D. Louisiana, Baton Rouge Division.

April 23, 1940.

Shotwell & Brown, of Monroe, for plaintiff.

Bertrand I. Cahn, Asst. Atty. Gen., of Louisiana, for defendants.

Before FOSTER and McCORD, Circuit Judges, and DAWKINS, District Judge.

DAWKINS, District Judge.

Plaintiff, Interstate Natural Gas Company, Inc. (hereafter called Interstate), seeks to enjoin the Louisiana Public Service Commission (hereafter called the Commission) and its individual members from attempting to regulate its business as a purchaser, transporter and dealer in natural gas. In addition, it prays for a declaratory judgment as to the controversy between it and the Commission.

Proceedings had been instituted by and before the Commission, for an investigation of plaintiff's affairs, with the view of fixing rates at which gas could be sold, as well as practices to be followed in connection therewith. Plaintiff appeared in that proceeding and excepted to the jurisdiction of the Commission on the grounds that it was not a common carrier pipeline, sold its gas by private contract, and its business was more than 95% interstate commerce. A hearing was had before the Commission, at which records and evidence were produced on the issue of jurisdiction by the complainant, and the plea was finally overruled. Thereupon, the present suit was filed, and the issues here are substantially the same as those presented to the Commission.

## Findings of Fact.

We find the material facts as follows: Plaintiff is a Delaware corporation, authorized to do business in Louisiana, and the defendants are the Public Service Commission and its individual members. Plaintiff's charter authorizes it, among other things, to:

"* * * search for, mine, bore, dig for, produce, refine, manufacture, treat, compress, blend, use, store, prepare for market, contract for, purchase or otherwise acquire, sell, exchange, and generally to deal in natural and artificial gas, petroleum and other oils, coal, sulphur, lignite and other minerals and mineral substances, and all kinds of products ..................... and by-products thereof, including natural gas-gasoline and casing head gasoline, and all implements and materials used in the production, manufacture, storage, transportation and sale of said gas, oil, and/or minerals and products and/or by-products thereof.

"To lay, maintain, own, lease or otherwise acquire and operate such pipe line or lines as may be necessary or convenient for the transportation and delivery of natural and/or artificial gas and/or oil purchased, produced or sold by the corporation.

"To erect, build, install, construct, purchase, or otherwise acquire, lease, own, possess, operate, maintain, and/or contract and deal with respect to all power and gasoline plants, compressing and pumping stations, and/or boosters, and/or all water, telephone, telegraph and/or electric transmission lines, rights of way, easements, privileges, and/or other interests in lands or property necessary or desirable in connection with the laying, building, installing, constructing, owning, leasing, acquiring, operating, and/or maintaining of said pipeline, and/or the business of dealing in natural and artificial gas, petroleum and other oils, minerals and mineral substances as herein provided.

*       *       *       *       *

"Provided that nothing herein shall be construed to authorize the corporation to transport natural gas for others as a carrier for hire or to sell natural gas for others as a carrier for hire, or to sell natural gas except by special contract, or to constitute the corporation a common purchaser of natural gas or a public utility corporation."

It owns and operates a 22 inch pipeline, extending in a general direction a little east of south from Fowler, Louisiana, to the city of Baton Rouge, a distance of 171.61 miles. Some 43.92 miles of this distance is across the southwest corner of the state of Mississippi. It owns extensive gas lands and leases in the Monroe field (some 60,000 acres), and, under specific contracts, sells large quantities of natural gas to other pipelines in the field, small quantities to industries and communities along the 91.17 miles of the line before it crosses the Mississippi River into Mississippi, along the 43.92 miles in that state, and from the 36.52 miles of its line after it re-enters Louisiana. By far the larger portion of the gas which it transports is under specific contract with the United Gas Corporation (hereafter called the United) for delivery at Baton Rouge.

During a period of twelve months from approximately July 1, 1937 to June 30, 1938, the quantities handled and distributions made, were as follows:

1—Sold to other pipelines in the field (mainly for transportation without the state)...... 15,450,666 m. Cu. Ft.

2—Sold to United in the Monroe field for transportation mainly to Baton Rouge..... ...........7,008,775 m. Cu. Ft.

3—Sold to small industries and local communities (85% of which was for public consumption) before the line reaches the Mississippi River ........................... 78,224 m. Cu. Ft.

4—Sold to distributors in the state of Mississippi.......... 223,309 m. Cu. Ft.

5—Sold after re-entering Louisiana to local towns and communities for domestic consumption 65,114 m. Cu. Ft. To Baton Rouge Electric Company ..........868,429 m. Cu. Ft. 933,543 m. Cu. Ft.

6—Sold to Louisiana Steam Generating Corporation at Baton Rouge ................. 8,558,553 m. Cu. Ft.

7—Transported to Baton Rouge for United under special contract (for delivery to the latter's pipeline which extends to the city of New Orleans) ........................ 22,274,127 m. Cu. Ft.

Total ..................... 47,518,422 m. Cu. Ft.

About 5.11% of its sales is for distribution to local communities and local industries, but this constitutes only about 2.41% of the entire quantity which it handles, including that transported for the United.

Plaintiff has never held itself out as a common carrier or public utility, but sells all of its own gas by private contract. It

operates compressor stations both at Fowler and Ferriday, Louisiana, to move the gas through its line. It was incorporated in 1926 and its stock is owned as follows:

"Interstate Natural Gas Company, Inc. Common Stock Holders.

| Company | No. Shares | Percentage |
|---|---|---|
| Standard Oil Company (New Jersey) | 514,266 | 53.97 |
| Frost Lbr. Industries, Inc. | 72,890 | 7.65 |
| Columbian Carbon Company | 164,807 | 17.29 |
| American Republics Corporation | 42,920 | 4.50 |
| The Rockefeller Institute for Medical Research | 40,000 | 4.20 |
| The Rockefeller Foundation | 33,763 | 3.54 |
| Ownership of remainder distributed among approximately 730 stockholders | 84,307 | 8.85 |
| | 952,953 | 100.00" |

Plaintiff filed with the Federal Power Commission copies of all contracts covering sales of gas, except those to local consumers and distributors between Fowler and the Mississippi River, nor did it include contracts with industrial consumers in Louisiana, such as Godchaux Sugars, Inc., Ethyl Gas Corporation at Baton Rouge, East Louisiana Hospital for the Insane at Jackson, Louisiana; DeHass-Eby Lumber Company of Sorento, Louisiana, and others along its line after it re-enters Louisiana from Mississippi. In other words, it filed with the Federal Power Commission only contracts covering what it considered interstate business. It furnished all the information called for and submitted its rates for approval. This was done, however, "with full reservation of any disposition the courts might make as to the legality of the act creating it", the Federal Power Commission. The gas handled for the United constituted 50.9% by volume of its business, all of which passed through Mississippi before delivery. There was no connection between plaintiff and the United other than the sale and transportation of gas.

The Standard Oil Company of New Jersey, as above indicated, owns 53.97% of plaintiff's stock, and the Standard Oil Company of Louisiana, one of plaintiff's largest customers, is a subsidiary of said Standard Oil Company of New Jersey.

We find further facts as stipulated, to-wit: Plaintiff has not filed with the Secretary of State in Louisiana a resolution of its Board of Directors agreeing that it shall be and act as a common carrier, according to Section 7 of Act 39 of the Louisiana General Assembly of 1906; it has not, at any time, exercised the powers of eminent domain; the state has not granted plaintiff a franchise to act either as a common carrier or a public utility, nor has it filed any reports as such; and we quote further from the stipulations, as follows:

"All gas sold and marketed by Interstate Natural Gas Company, Incorporated, is sold and marketed:

"(a) At wholesale to other companies or corporations who, in turn, sell and distribute the same to consumers, deliveries of which gas are made by Interstate Natural Gas Company, Incorporated, at taps on its main line to such purchasers; or

"(b) To industrial consumers, deliveries of which gas is made by Interstate at taps on its main line to such purchasers; or

"(c) To corporations operating interstate pipe lines extending from the State of Louisiana into other states, deliveries of which gas are made by interstate to such purchasers at the compressor stations of said purchasers, as hereinafter more particularly set out.

"VI. No part of the expenses assessed against the utility being investigated under the terms and provisions of Act 20 of the Second Extra Session of the Legislature of the State of Louisiana for the year 1934 is retained by the Louisiana Public Service Commission or any of the members thereof, but all such sums are paid directly to such person or persons, firms and/or corporations, retained by the Commission to conduct the investigations contemplated by said act."

In its opinion in proceeding No. 2720 on its docket, dated February 1, 1939, the Commission declared "that the Interstate Gas Company is (was) a public utility subject to the jurisdiction of the Commission" and ordered it to "give this Commission and its representatives access to its property, books and records, for the purpose of determining fair and reasonable rates and charges for gas transported or sold in intrastate commerce in Louisiana." Application for rehearing was made and finally over-ruled on May 29, 1939.

On or about November 5, 1938, the Commission employed one Mark Wolff, a public utility expert, to conduct an examination of plaintiff's records and affairs at a round figure of $45,000, to be paid in five equal installments. The Commission rendered to plaintiff a bill for $9,000 for the work and

services of Wolff from September 14, 1938 to February 28, 1939, and by a letter dated March 8, 1939, demanded payment thereof. Plaintiff filed suit in this Court March 22, 1939 for an injunction to restrain the collection of said bill, whereupon the Commission withdrew and cancelled said bill, until it had passed upon the application for rehearing, which was then pending on its ruling with respect to jurisdiction, and plaintiff dismissed its said suit in this Court.

The present suit was filed on May 30, 1939 and a restraining order was issued, but, before hearing upon the application for preliminary injunction, the matter was, by consent, continued and the restraining order held in force, for hearing some time in October. The hearing was actually had before this statutory court of three Judges on December 8, 1939. A motion to dismiss previously filed was at that time withdrawn and the application for preliminary injunction was submitted on its merits.

### Conclusions of Law.

Act No. 20 of the Second Extra Session of the Louisiana Legislature for the year 1934 (Section 1) authorizes the Commission to "make an examination of the affairs of any public service or public utilities corporation doing business in this State, for the purpose of fixing and regulating the rate charged or to be charged or services to be rendered * * * all expenses incurred * * * in conducting such examination, including the expenses and fees of engineers, consultants, accountants and clerical assistants specially employed by said Commission * * * shall be paid by the corporation so examined." The compensation (Section 2) for such services is required to "be fixed according to the time actually devoted to the work * * * which compensation shall always be reasonable and commensurate with the value of the service performed * * upon * * completion of the examination, or while the same is in process, it shall be the duty of the * * * Commission to certify to the corporation being examined, the amount of expenses incurred as provided in this act, whereupon the corporation shall pay the amount so certified to such person or persons thus employed; provided, however, that should the corporation deem the amount of the expenses * * * unreasonable or contrary to the provisions of this Act, it may, within fifteen days after the receipt of such certificate, take a rule in a court of competent jurisdiction against

the * * * Commission, to test the reasonableness and legality under this Act, of the amount of expenses certified * * * which rule shall be tried by preference, and upon appeal shall be given preference in the Appellate Court * * *"; (Section 3) If "any company fail or refuse to pay * * after final judgment * * * the * * Commission may revoke the certificate of authority of such company to do business until the full amount of same is paid"; (Section 4) "The provisions of this Act shall apply to all kinds of public service and public utilities, corporations doing business in this State * * * whose rates or service is, in whole or in part, subject to the regulation of the * * * Commission."

On the application for preliminary injunction, the first question is, Has the plaintiff a standing in equity, upon the showing made, to prevent the Commission from proceeding with the investigation at plaintiff's expense under the provisions of this statute? As we understand it, plaintiff has not attacked the constitutionality of the said Act, but takes the position that the Commission, having entertained the plea to the jurisdiction, held a hearing thereon, at which the evidence was presented by complainant sustaining its contention that it was not a common carrier or public utility, but engaged solely as a private contractor, and almost all of its business was in interstate commerce, the Commission was without power to proceed further and should be enjoined from doing so pending the action of this court upon the prayer for a declaratory judgment declaring that plaintiff is not subject to the Commission's jurisdiction. It also charges, in effect, that for the reasons stated, to permit the Commission to proceed would constitute a taking of its property without due process and be a denial to it of equal protection under the law in violation of the Federal Constitution.

As the petition alleges and the record shows, the Commission "withdrew and cancelled" the bill for $9,000 for expenses and services rendered by Wolff, until it had passed upon the application for rehearing. The evidence adduced before the Commission on the plea to the jurisdiction was solely that furnished by the plaintiff, except a few questions on cross-examination by counsel for the Commission. The Commission offered nothing in defense for the reason, as it now asserts, the information was all in the possession of plaintiff and

without an investigation, it was impossible to know what facts were available to dispute or contradict those offered by it. However, the petition in this case alleges: "(a) Petitioner further shows that the Louisiana Public Service Commission, at the trial of petitioner's plea to the jurisdiction of the Commission, did make such investigation of the business and affairs of petitioner as is necessary to determine whether or not petitioner is a common carrier pipe line or a public utility or is engaged in intrastate commerce subject to the jurisdiction of the Louisiana Public Service Commission, and that no further or additional investigation or examination by the Louisiana Public Service Commission is necessary for the purpose of properly determining those questions. Petitioner further shows that it verily fears and believes, and so believing avers, that the Louisiana Public Service Commission will proceed pursuant to its said order of February 1, 1939, with an examination of petitioner's property, books, records, and papers for the purpose of determining and fixing rates and charges for gas transported and sold by your petitioner, and that the Louisiana Public Service Commission will certify to and demand payment by your petitioner of large amounts of money which your petitioner believes will aggregate not less than $45,000, all of which amount will in turn be paid by said Louisiana Public Service Commission to said Mark Wolff in accordance with the aforesaid agreement, and which amounts your petitioner will be unable to recover should it be ultimately held that Louisiana Public Service Commission is without jurisdiction to conduct said examination and determine and fix the rates and charges to be made by your petitioner for transportation and sale of natural gas, all of which the said Louisiana Public Service Commission is now threatening to do and which will constitute a taking of petitioner's property without due process of law, all to the irreparable injury of your petitioner."

In answer to this paragraph of the petition, the defendants say: "That they admit the allegations contained in Paragraph 17 (a) of petitioner's complaint, except that they deny that the petitioner will be unable to recover the expenses of the investigation certified by the Louisiana Public Service Commission in the event it is finally held that the Louisiana Public Service Commission is without jurisdiction over petitioner."

■ The principal question presented therefore, is, Should this court stop the investigation as to rates until it can pass upon the demand for a declaratory judgment? It would seem that the petition, on its face, presents a case of an actual controversy, that is, as to whether plaintiff is subject to the jurisdiction of the Commission, but so far it has not entered an affirmative order to do or not do anything except the payment for the investigation as to rates, practices, etc., and for which it is admitted payment will be required according to the state statute. Of course, if the Commission is entitled to proceed with the investigation, regardless of what the outcome may be, then it would seem that it may, within the limits of the Act, whose constitutionality, as stated, has not been assailed, require payment therefor.

In Petroleum Exploration, Inc. v. Public Service Commission of Kentucky, 304 U.S. 209, 58 S.Ct. 834, 839, 82 L.Ed. 1294, the plaintiff also sought to enjoin a state Commission from conducting an examination similar to that undertaken here, and which was resisted also upon the ground it was not a public utility. The Petroleum Company was a Maine corporation, which produced or purchased its gas in Kentucky and transported it wholly intrastate to distributing agencies at the "city gates", where it was sold by private contract to other companies, having no connection otherwise with the complainant, except one in which it held a "dominant interest". Under a statute of the state of Kentucky, similar to the one in this state, proceedings were instituted for an investigation to fix rates and determine practices of the Petroleum Company. Just, as here, a plea to the jurisdiction was filed before the Commission and denied; suit was filed in the Federal Court, before the application for rehearing had been passed upon, setting up substantially the same grounds as here, save the one of interstate commerce. In disposing of the matter, the court, in part, said:

"The bill asks injunctive relief to restrain the Commission from further prosecuting the 'investigation' into the price of gas sold under appellants contracts to the distributing agencies. Two decisions dealing with orders for furnishing information have recently been handed down by this Court. In both cases this Court dealt with the merits of the respective orders, determining that there was no constitutional basis for saying that 'any person is immune

from giving information appropriate to a legislative or judicial inquiry.' Here there is no need to consider the validity of the challenged order. To justify the use of the extraordinary power of a court of equity something more must be involved than an application of a statute in an unconstitutional manner against complainant. There must be an allegation and proof of threatened injury under some of the recognized sources of equitable jurisdiction. The one most frequently relied upon in constitutional cases, and pleaded here, is irreparable injury. To furnish the information required by the order will cost $25,000, arising from the necessity of preparing for the hearing on rates. Is this irrecoverable expense a threatened irreparable injury which a court of equity will guard against by injunction? Whether or not equitable relief will be granted rests in the sound discretion of the court.

"It is true that the injury which flows from the threat of enforcement of an allegedly unconstitutional, regulatory state statute with penalties so heavy as to forbid the risk of challenge in proceedings to enforce it, has been generally recognized as irreparable and sufficient to justify an injunction. The Commission urges that, since there is ample opportunity for the appellant to contest in a state court any effort to regulate or punish for disobedience of orders, with ultimate review by this Court, there is no irreparable injury, and that the dangers of lowered rates and threatened punishments can be overcome by opposition when an effort is made to enforce them. The case of Federal Trade Commission v. Claire Furnace Co., 274 U.S. 160, 47 S.Ct. 553, 71 L.Ed. 978, where an effort was made to secure an injunction against enforcement of a Federal Trade Commission order to produce information, has been cited as a precedent. There were heavy penalties for violation of that order, but the opinion discussed the issues from the standpoint of failure to exhaust administrative remedy. Appellant here insists that it is compelled to choose between compliance, at a heavy cost, or noncompliance with obvious risks of severe, though nonrecurring and noncumulative, penalties; and that to stand by subjects appellant to the further risk that the Commission will fix its rates on the Commission's evidence alone. We may assume, without deciding, that the risk of these penalties would be sufficiently great to require the interposition of a court of equity to protect appellant against a regulatory order.

"Compliance with this order, however, subjects appellant only to an expense in preparing for and carrying out an investigation. It is not suggested that the expense is disproportionate to the business of appellant, valued by the District Court as in excess of $1,500,000, and involving sales of about one billion cubic feet per annum, at a price of $350,000. No order has been entered fixing rates or regulating conduct. The necessity to expend for the investigation or to take the risk for noncompliance does not justify the injunction. It is not the sort of irreparable injury against which equity protects.

"The weight to be given complaints of irrecoverable and irreparable cost and damage in proceedings to enjoin hearings, initiated by a federal governmental agency in a matter alleged by complainants to be beyond the agency's powers, was considered in Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638, decided January 31, 1938. In an effort to enjoin hearings by the National Labor Relations Board, the Corporation alleged (see 303 U.S. at p. 47, 58 S.Ct. 459, 462, 82 L.Ed. 638):

" 'that hearings would, at best, be futile; and that the holding of them would result in irreparable damage to the corporation, not only by reason of their direct cost and the loss of time of its officials and employees, but also because the hearings would cause serious impairment of the good will and harmonious relations existing between the corporation and its employees, and thus seriously impair the efficiency of its operations.'

"Further allegations pointed out similar substantial damages in preceding investigations. See note 4 idem. While other grounds were factors in our conclusion to reverse the decree for an injunction, we said (303 U.S. 51, 58 S.Ct. 459, 464, 82 L.Ed. 638):

" 'Lawsuits also often prove to have been groundless; but no way has been discovered of relieving a defendant from the necessity of a trial to establish the fact.'

"It may be suggested that in the Bethlehem Shipbuilding Case the employer had not presented to the Board its contention of constitutional immunity, and that proof of that immunity would have constituted no greater injury if presented to the Board

than the courts, whereas here the appellant has already been overruled by the Commission on the question of appellant's constitutional immunity, and so would be subject to greater expense by presenting further evidence on another matter before the Commission than by proceeding in an equity court and there contesting the Commission's jurisdiction. This was the argument presented to the Court, but not discussed, in United States v. Illinois Central R. Co., 244 U.S. 82, 85, 86, 37 S.Ct. 584, 61 L.Ed. 1007. The situation is still controlled by the abiding and fundamental principle of this aspect of the Bethlehem Shipbuilding Case, that the expense and annoyance of litigation is 'part of the social burden of living under government.' The authority in other courts is in accord."

As stated, this case involved practically every issue of the one now under consideration, save that of interstate commerce.

In Arkansas Louisiana Gas Co. v. Department of Public Utilities, 304 U.S. 61, 58 S.Ct. 770, 771, 82 L.Ed. 1149, the plaintiff produced or purchased its gas in the states of Texas and Louisiana, and transported it by pipeline, to Arkansas, where it sold to distributing corporations. These sales were under contracts made in Shreveport, Louisiana. It also maintained a "distribution department" through which it made sales locally in Arkansas, but this organization was "distinct from the one which supplie[d] pipe line customers". The Commission ordered it to file schedules of rates, etc. This was done with respect to "local utility service in the state", but declined as to "pipe line customers." Whereupon, the Commission ordered it "to show cause for this failure", and in response it set up that this business was "interstate commerce, and that in making such sales and deliveries it was and is not acting as a public utility." At the hearing "much evidence" was taken, but the Commission directed "compliance with the general order." The matter was taken into the state courts, and the Commission was sustained. The order was then attacked in the United States Court as being violative of the federal Constitution. The Supreme Court of the United States had this to say:

"The question for present determination is whether this general order, valid under the laws of the state, which only compels appellant to file certain designated information, amounts to an infringement of any right or privilege guaranteed to it by the Federal Constitution. And to this a negative answer must be given.

"If, as claimed, certain of appellant's activities in Arkansas are parts of interstate commerce, that alone (and no other defense is relied upon) would not suffice to justify refusal to furnish the information presently demanded by the state.

"Appellant operates locally at many places in Arkansas and also delivers within the state great quantities of gas said to move without interruption from another state. In such circumstances it may be highly important for the state authorities to have information concerning all its operations. We are unable to see that merely to require comprehensive reports covering all of them would materially burden or unduly interfere with the free flow of commerce between the states.

"In case the Department undertakes by some future action to impose what may be deemed unreasonable restraint or burden upon appellant's interstate business through rate regulation or otherwise, that may be contested. The rule here often announced is that no constitutional question will be passed upon unless necessary for disposition of the pending cause."

■ It is true that in the case last cited, the furnishing of the reports did not entail any great burden, in the way of investigations, upon interstate commerce, while it is shown in the present case that plaintiff will be compelled to pay $45,000 for the investigation. However, the language used does not appear to have been directed so much to that particular point, but in view of the fact that, admittedly, complainant was carrying on in another department, local or intrastate business, it was not a burden upon interstate commerce to require the furnishing of information from which the relationship and extent of the two kinds of commerce could be determined and rates fixed accordingly. The plaintiff in the present case does sell to consumers and distributors wholly within the state of Louisiana, and we are not prepared to say on the showing made, such sales and practices cannot be regulated by the state Commission. It is commonly known that, in most instances, the supplying of natural gas for local distribution and consumption is a natural monopoly. Given a situation where a single company has, at great expense, built a pipeline from a state producing large quantities of gas into another that produces none, where it is sold indiscriminately, by

private contract, both to local distributors and to industrial consumers at figures which it would not disclose. To say that a state Commission, such as the defendant in this case, could not investigate its business and require it to furnish information at least as to its sales to direct consumers, seems to us quite extraordinary. As stated in the last cited case, to require such information in the first instance, as here, and before any final order as to rates and practices is entered, would not justify the interference of a court of equity simply because the plaintiff would be compelled to bear the expense of the investigation necessary to supply it.

In Myers et al. v. Bethlehem Shipbuilding Corporation, 303 U.S. 41, 58 S.Ct. 459, 463, 82 L.Ed. 638, the complainants sought to enjoin an investigation by the National Labor Relations Board for the reason that it was not engaged in interstate commerce, which, of course, is the converse of the contention of the present plaintiff. In other words, that the Board had not jurisdiction. In disposing of the matter, the Court said:

"Third. The corporation contends that, since it denies that interstate or foreign commerce is involved and claims that a hearing would subject it to irreparable damage, rights guaranteed by the Federal Constitution will be denied unless it be held that the District Court has jurisdiction to enjoin the holding of a hearing by the Board. So to hold would, as the government insists, in effect substitute the District Court for the Board as the tribunal to hear and determine what Congress declared the Board exclusively should hear and determine in the first instance. The contention is at war with the long-settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted. That rule has been repeatedly acted on in cases where, as here, the contention is made that the administrative body lacked power over the subject matter.

"Obviously, the rule requiring exhaustion of the administrative remedy cannot be circumvented by asserting that the charge on which the complaint rests is groundless and that the mere holding of the prescribed administrative hearing would result in irreparable damage. Lawsuits also often prove to have been groundless; but no way has been discovered of relieving a defendant from the necessity of a trial to establish the fact."

In Natural Gas Pipeline Company v. Slattery, 302 U.S. 300, 58 S.Ct. 199, 201, 82 L.Ed. 276, the Supreme Court of the United States had under consideration a case where it was sought to enjoin the Illinois Commerce Commission (a body exercising substantially the same functions as the Commission in the present case) "from enforcing an order by which appellant was directed to open its records and accounts to inspection by the commission and to furnish certain statistical data for use in a proceeding pending before it." The appellant, a Delaware corporation, transported its gas through pipelines from Oklahoma to Illinois where it was sold under a long term contract to the District Company, which in turn distributed it to consumers. The latter company was subject to the jurisdiction of the Commerce Commission and all of its shares of stock were owned by another Illinois corporation, known as Natural Gas Investment Company, in which latter company, the Natural Gas Company, owned 26.63% of the stock. The Commerce Commission had found that the president of the District Company was president and director of the Investment Company, also a director of the appellant, and that a director of the District Company and of the Investment Company was also a vice-president of appellant. The statute of Illinois, Ill.Rev.Stat.1937, c. 111⅔, § 8a(2), gave the Commerce Commission jurisdiction over "affiliated interests having transactions, other than ownership of stock and receipt of dividends thereon, with public utilities under the jurisdiction of the commission, to the extent of access to all accounts and records of such affiliated interests relating to such transactions * * * and to the extent of authority to require such reports with respect to such transactions to be submitted by such affiliated interests, as the commission may [might] prescribe." The state statute also defined "affiliated interests" as including:

" '(c) Every corporation, ten per centum or more of whose voting capital stock is owned by any person or corporation owning ten per centum or more of the voting capital stock of such public utility; * *

" '(f) Every corporation which has one or more elective officers or one or more directors in common with such public utility.' "

In a proceeding against the District Company to determine whether rates should be reduced, to which appellant was not a par-

ty, it was found by the Commerce Commission that the appellant was an affiliated company, and that in order to fix reasonable rates for the sale of gas, "inquiry was necessary into the operating charges, including cost of gas purchased from appellant." The Commission's order complained of was accordingly entered. The state statute was attacked as unconstitutional on the ground that it infringed the due process clause of the Federal Constitution. In disposing of the contention, the Supreme Court said:

"We can find in the commerce clause and the Fourteenth Amendment no basis for saying that any person is immune from giving information appropriate to a legislative or judicial inquiry. A foreign corporation engaged exclusively in interstate commerce within the state is amenable to process there as are citizens and corporations engaged in local business. International Harvester Co. v. Kentucky, 234 U. S. 579, 34 S.Ct. 944, 58 L.Ed. 1479. It is similarly subject to garnishment and writ of attachment. Davis v. Cleveland, C., C. & St. L. Ry. Co., 217 U.S. 157, 30 S.Ct. 463, 54 L.Ed. 708, 27 L.R.A.(N.S.) 823, 18 Ann.Cas. 907. It can be deemed to be no less subject, on command of a state tribunal, to the duty to give information appropriate to an inquiry pending there. The present investigation · is not a regulation of interstate commerce and it burdens the commerce no more than the obligation owed by all, even those engaged in interstate commerce, to comply with local laws and ordinances, which do not impede the free flow of commerce, where Congress has not acted. Smith v. Alabama, 124 U.S. 465, 8 S.Ct. 564, 31 L.Ed. 508; Red 'C' Oil Co. v. Board of Agriculture, 222 U.S. 380, 32 S. Ct. 152, 56 L.Ed. 240; Minnesota Rate Cases (Simpson v. Shepard), 230 U.S. 352, 402–412, 33 S.Ct. 729, 57 L.Ed. 1511, 48 L. R.A.(N.S.) 1151, Ann.Cas.1916A, 18; Clyde Mallory Lines v. Alabama ex rel. State Docks Comm'n, 296 U.S. 261, 56 S.Ct. 194, 80 L.Ed. 215, and cases cited.

"This Court has often recognized that the reasonableness of the price at which a public utility company buys the product which it sells is an appropriate subject of investigation when the resale rates are under consideration, and that any relationship between the buyer and seller which tends to prevent arm's length dealing may have an important bearing on the reasonableness of the selling price. United Fuel & Gas Co. v. Railroad Commission, 278 U.S. 300, 320

49 S.Ct. 150, 156, 73 L.Ed. 390; Smith v. Illinois Bell Tel. Co., 282 U.S. 133, 144, 51 S.Ct. 65, 67, 75 L.Ed. 255; Western Distributing Co. v. Public Service Comm'n, supra, 285 U.S. 119, 124, 52 S.Ct. 283, 284, 76 L.Ed. 655; Dayton Power & L. Co. v. Public Utilities Comm'n, 292 U.S. 290, 54 S.Ct. 647, 78 L.Ed. 1267. We have not said, nor do we perceive any ground for saying, that the Constitution requires such an inquiry to be limited to those cases where common control of the two corporations is secured through ownership of a majority of their voting stock. We are not unaware that, as the statute recognizes, there are other methods of control of a corporation than through such ownership. Common management of corporations through officers or directors, or common ownership of a substantial amount, though less than a majority of their stock, gives such indication of unified control as to call for close scrutiny of a contract between them whenever the reasonableness of its terms is the subject of inquiry. In these circumstances, appellant can hardly object to the attempted inquiry into the fairness of the price. Cf. Corsicana National Bank v. Johnson, 251 U.S. 68, 90, 40 S.Ct. 82, 91, 64 L.Ed. 141, and cases cited; Geddes v. Anaconda Copper Mining Co., 254 U.S. 590, 599, 41 S.Ct. 209, 212, 65 L.Ed. 425; Western Distributing Co. v. Public Service Comm'n, supra, 285 U.S. 119, 124, 52 S.Ct. 283, 284, 76 L. Ed. 655; Globe Woolen Co. v. Utica Gas & Elec. Co., 224 N.Y. 483, 121 N.E. 378. The price itself may be found to be so exorbitant as to persuade that the bargaining was not at arm's length. Corsicana National Bank v. Johnson, supra. We cannot say that the Illinois statute is subject to any constitutional infirmity in so far as it demands access to the books and accounts of appellant or requires production of the information which the order seeks."

Of course, there is a substantial difference in the circumstances of the present case and the one last cited, in that the proceedings before the Louisiana Commission here assailed was one against the Interstate itself to determine if orders should be entered fixing its rates and affecting its practices; while in the Illinois case, it was against another utility, and the complainant, not a party to the proceeding before the Commission, had been directed to furnish information merely for the purpose of fixing rates of this other and affiliated company. Neither does it appear that there is

any express statute in Louisiana, such as that of Illinois, affecting affiliated interests. But it does appear that the Standard Oil Company of Louisiana, the purchaser of a substantial quantity of gas from Interstate, is an affiliated company of the Standard Oil Company of New Jersey, which, in turn, owns more than 50% of the stock of complainant. This is disclosed by the evidence and information furnished by complainant alone to the Louisiana Commission on the plea to its jurisdiction, without the latter having had a chance through investigation to ascertain whether or to what extent other circumstances may exist to show connection between the complainant and its customers, or to what extent its rates may affect the prices which distributors, to whom complainant sells, charge their customers for the gas.

■ It is true that the Louisiana statute appears to apply only to public utilities operating in intrastate commerce, but it would seem that the Commission should be permitted, regardless of any express authority with respect to affiliates, to make investigation of and require information from concerns such as plaintiff, with respect to its dealings with local utilities, serving the public, when the monopolistic character of the gas business is such that its price may be fixed by complainant largely according to its own views and would be governed, no doubt, by what "the traffic would stand." Even if it should ultimately develop and the Commission should hold that it does not have the power to fix rates and determine practices to be followed by complainant, or if the courts should hold to that effect, the investigation directed by the Commission would have served its purpose; first, to produce full information for its own action in the particular proceeding, and, second, to aid it in dealing with utilities to which the plaintiff sells. It might also, incidentally, serve to permit a better defense to the present suit. If the plaintiff is thus subjected to expenses which it would otherwise not have to incur it will be because of the very nature of its business. The producing and dealing in natural gas is commonly known to be affected with a public interest, more or less, and it is generally recognized that regulation should, under the police power of the state, be exercised in the interest of the public, which is composed, not alone of domestic or household consumers, but industrial enterprises, to whom sales are made directly.

It is our view that the showing made does not warrant a court of equity in enjoining the investigation merely because of the expense, which, as pointed out by Judge Hutcheson in his dissenting opinion in Southern Bell Telephone & Telegraph Co. v. Louisiana Public Service Commission, D. C., 15 F.Supp. 1057, at page 1063, "really takes nothing from the utility" because the rates or prices charged by it (whether in its interstate or intrastate commerce) will be based upon the cost of doing business, including the furnishing of information such as that sought by the Commission.

■ As to the contention with respect to the amount and manner of payment of this expense to be assessed against plaintiff, the state law, itself, provides ample means for contesting the same and to protect complainant against unreasonable action on the part of the Commission.

Our conclusion is that the preliminary injunction should be denied.