INTERSTATE NATURAL GAS CO., Inc.,
v. FEDERAL POWER COMMISSION
et al.

No. 10701.

Circuit Court of Appeals, Fifth Circuit.

Aug. 3, 1946.

Rehearing Denied Oct. 1, 1946.

WALLER, Circuit Judge, dissenting.

———◆———

Henry P. Dart, Jr., and H. Grady Price, both of New Orleans, La., Alden T. Shotwell, of Monroe, La., and William A. Dougherty and C. W. Cooper, both of New York City, for petitioner.

Bradford Ross, Gen. Counsel, Federal Power Commission, Charles E. McGee, Asst. Gen. Counsel, Federal Power Commission, Louis W. McKernan and Milford Springer, Principal Attys., Federal Power Commission, all of Washington, D. C., for the Federal Power Commission.

W. C. Perrault, First Asst. Atty. Gen., of Louisiana, for respondent Louisiana Public Service Commission.

Warren O. Coleman, Edward Rightor, and Francis P. Burns, all of New Orleans, La., for City of New Orleans, La. (intervener).

Roland C. Kizer, of Baton Rouge, La., for respondent City of Baton Rouge, La.

Donald C. McCreery, of Denver, Colo., for Independent Natural Gas Association of America, amicus curiae.

Before SIBLEY, HUTCHESON, and WALLER, Circuit Judges.

HUTCHESON, Circuit Judge.

The proceeding under review here was brought under Section 5(a) [1] of the Natur-

---

[1] "Sec. 5(a) Whenever the Commission, after a hearing had upon its own motion or upon complaint of any State, municipality, State Commission, or gas

al Gas Act[2] as a general investigation of the reasonableness of all the rates of petitioner, subject to the jurisdiction of the commission.

Petitioner, as to all of its rates sought to be investigated, denied that any of them were unreasonable, and as to sales of natural gas, made by it in the Monroe Gas Field to certain pipe line companies,[3] it insisted that the rates and charges were not within the jurisdiction of the commission, that, indeed, as part of the production and gathering of the gas, they were by the statute expressly withdrawn from its jurisdiction.

The Commission found that all of the sales to these companies were "[sales] in interstate commerce of natural gas for resale for ultimate public consumption" within the meaning of Section 1(b),[4] the jurisdictional section of the act, and that the charges made were unreasonable. Its order required reductions in these rates from 7.39¢ to 4.66¢ per M.c.f.

Petitioner is here complaining: (1) that the sales were not within, but were expressly excluded from, the jurisdiction of the commission; and (2) that the order as to them is confiscatory. In support of its first position, it relies not only on the language of the act, but on what it calls "authorized statements of commission representatives", and "legislative history". In support of its second position it points to the fact that the charges the order fixed as reasonable are considerably less than the average price, 5.5¢, which petitioner pays for gas

purchased by it in the field, and that 1.1¢ must be added to this as gathering costs. Thus for gas which cost it 6.6 cents, the order allows it to charge only 4.66 cents.

In answer to petitioner's first position, the Commission points to the precise language of the section, that the provisions of the act "shall apply to the sale in interstate commerce * * * for resale for ultimate public consumption * * *"; to the undisputed fact admitted by petitioner that the sales the order deals with are in interstate commerce; to the legislative history of the act in question as distinguished from the history of prior acts introduced but not enacted into law, on which petitioner relies; and to Peoples Natural Gas v. The Commissioner, 75 U.S.App.D.C. 235, 127 F.2d 153; and other cases which it claims support its view.

As to petitioner's second point, that the order was confiscatory, the Commission invokes the settled principle that the rate order must be viewed not piecemeal but in its entirety, that, in short, if as a whole the order affords just compensation, the fact that some particular rate in the schedule of rates, viewed by itself alone, may appear to be low, is immaterial. Basing on that principle, it points to the admitted fact that the rate schedules as a whole established by the order are producing a 6.5% return on the rate base fixed. As to the precise rates, the Commission insists that since petitioner operates an integrated pipeline system in which both produced and purchased gas are commingled and disposes of a great

---

distributing company, shall find that any rate, charge, or classification demanded, observed, charged, or collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order:" 15 U.S.C.A. § 717d (a).

[2] 52 Stat. 821, 15 U.S.C.A. § 717 et seq.

[3] Mississippi River Fuel Corp.; South-

ern Natural Gas Co.; United Gas Pipe Line Co. for account Memphis Natural Gas Co.

[4] Sec. 1(b) of the Natural Gas Act provides:

"The provisions of this act shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas."

part of its gas to others than these pipe-lines in question, there is no way of knowing just what is the source of the gas delivered to petitioner's pipeline customers. By figures it demonstrates that the cost of the gas produced is less than the 4.66¢ allowed, and it insists that it is not, and cannot be, made to appear that that charge even by itself is confiscatory.

■ We agree with the Commission that the rates are within its jurisdiction and that petitioner has failed to show that they are confiscatory.

■ Disposing first of the question of compensation, we need not inquire whether, if it stood alone, the rate allowed would be confiscatory. It is sufficient to say that the Commission is correct in its position that the rate order must be viewed in its entirety, and that "it is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end." Federal Power Comm. v. Hope Natural Gas, 320 U.S. 591, 64 S.Ct. 281, 288, 88 L.Ed. 333; Panhandle v. Federal Power, 324 U.S. 635, 65 S.Ct. 821, 89 L.Ed. 1241; Cities Service Co. v. Federal Power Comm., 10 Cir., 155 F.2d 694.

■ On the jurisdictional point, we think the language employed in the bill as it finally passed, "The provisions of this act shall apply * * * to the sale in interstate commerce of natural gas for resale for ultimate public consumption, and to natural gas companies engaged in such transportation or sale" leaves in no doubt that the sales in question are within its purview. That they are sales in interstate commerce, we think is settled by the authorities.[5] That the gas was sold for resale for ultimate public consumption, we think may not be doubted. This being so, the exception of the statute that it shall not apply to "any other * * * sale of natural gas" is unavailing to petitioner, for if the sale is the kind named in the first quoted clause, it certainly cannot be "any other sale".

■ We think petitioner's difficulties in construction and interpretation arise out of the fact that, treating unlike things as alike, it tries to read the exception with respect to production or gathering as an exception with respect to sales. There is no warrant in the act for so doing. It is very simply and plainly written. After stating what it shall apply to, it then states what it shall not apply to. Under familiar rules of construction, a negation in or exception to a statute will be construed so as to avoid nullifying or restricting its apparent principal purpose and the positive provisions made to carry them out. No conflict with them will, therefore, be found unless the conflict is clear and inescapable and then only in the precise point of the conflict. Cf. Hartford v. Federal Power, 2 Cir., 131 F.2d 953. Here the statute was drawn to regulate, it picked out for inclusion "sale in interstate commerce of natural gas for resale for ultimate public consumption." It excluded from the scope of the act sales other than of this kind. It included transportation in interstate commerce. It excluded local distribution of natural gas.

Unnecessarily perhaps but in the interest of making clear that the act gave jurisdiction only over sales and transportation of the kind described in it, it used language removing from any doubt that the Commission was not to have jurisdiction over properties used for production and local distribution or the activities of production and gathering. It did this by expressly providing that the act should not apply "to the facilities used for such [i. e. local] distribution or to the production or gathering of natural gas."

In Peoples Natural Gas Co. v. Federal Power Comm., 75 U.S.App.D.C. 235, 127 F.2d 153, the court found that a sale in Pennsylvania to an interstate pipeline company which immediately transported it to New York was a sale of natural gas in interstate commerce for resale, and, so finding, held that the provision that the act did not apply to production or gathering

---

5 Missouri v. Kansas Gas Co., 265 U.S. 298, 44 S.Ct. 544, 68 L.Ed. 1027; Public Service Comm. v. Attleboro Steam & Elec. Co., 273 U.S. 83, 47 S.Ct. 294, 71 L.Ed. 549.

did not limit the commission's jurisdiction over such sales.[6]

In the Canadian River Gas case, 324 U.S. 581 at pages 602–603, 65 S.Ct. 829, 839, 89 L.Ed. 1206, the Supreme Court rejected the argument which petitioner advances here that unless the meaning it contends for is given to the provision with respect to gathering and distribution, that provision will be meaningless. It said:

"That does not mean that the part of § 1 (b) which provides that the Act shall not apply 'to the production or gathering of natural gas' is given no meaning. Certainly that provision precludes the Commission from any control over the activity of producing or gathering natural gas. For example, it makes plain that the Commission has no control over the drilling and spacing of wells and the like. It may put other limitations on the Commission. We only decide that it does not preclude the Commission from reflecting the production and gathering facilities of a natural gas company in the rate base and determining the expenses incident thereto for the purposes of determining the reasonableness of rates subject to its jurisdiction."

A careful reading of petitioner's brief, especially of that portion of it devoted to the legislative history, shows that its difficulties flow from the fact that it does not distinguish between the Lea Bill, House Bill No. 11,662, proposed in 1936, but never passed, and the bill which became the law now under review. Legislative history "cannot be resorted to for the purpose of construing a statute contrary to the natural import of its terms. * * * If the language be clear, it is conclusive." Peoples Natural Gas Co. v. Federal Power Comm., supra [127 F.2d 159], quoting from United States v. Shreveport Grain Co., 287 U.S. 77 at page 83, 53 S.Ct. 42, 77 L.Ed. 175. Certainly the legislative history of a bill that was not adopted cannot be resorted to to construe a bill that was.

It is quite plain that from the time the Lea Bill was introduced until the Natural Gas Act was passed, the ideas of the proponents of the legislation underwent considerable change. The purpose of the Natural Gas Act, as shown in the Senate and House Committee reports, which are identical, was to provide for the regulation of natural gas companies transporting and selling natural gas in interstate commerce. Its proponents were not interested in the production of gas or the individual sales of gas at the well. Nor were they interested in the gathering of the gas in the field. What they were interested in, as the report in terms states, what they were trying to reach, was wholesale sales of gas. Says the report:

"There is no intention in enacting the present legislation to disturb the states in their exercise of such jurisdiction. However, in the case of sales for resale, or so-called wholesale sales in interstate commerce, (for example sales by producing companies to distributing companies) the legal situation is different. Such transactions have been considered to be not local in character, and, even in the absence of congressional action, not subject to state regulation. (See Missouri v. Kansas Gas Co., 1924, 265 U.S. 298, 44 S.Ct. 544, 68 L.Ed. 1027, and Public Service Commission v. Attleboro Steam & Electric Co., 1927, 273 U.S. 83, 47 S.Ct. 294, 71 L.Ed. 549) The basic purpose of the present legislation is to occupy this field in which the Supreme Court has held that the States may not act."

It would be difficult to conceive language better adapted to achieve this purpose than the language of the act in question here. It would be difficult to find a case more clearly illustrating the mischief which the act was supposed to remedy, more fittingly applying the remedy. The statute expressly provides that "it shall apply to the transportation of natural gas in intersate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale * * *". It is conceded that Interstate is a natural gas company engaged in interstate transportation and sale, and it is further established that it, in In-

---

[6] Cf. Missouri v. Kansas Gas Co.; Public Service Comm. v. Attleboro Steam & Electric Co., supra.

terstate Natural Gas Co. v. Public Service Comm., D.C., 33 F.Supp. 50, D.C., 34 F. Supp. 980, successfully contended in the Federal Court that sales to the pipelines in question were sales in interstate commerce and beyond the reach of the State Commission. This is not to say that its success in so contending would estop it from claiming the contrary here or that the decision it obtained there is controlling here. It is to say though that the position it took and the decision it obtained give force and color to the avowed purpose of the Natural Gas Act as House and Senate Committees stated it, and that it seems clear to us that it would be difficult to find a case falling more clearly within both the purpose and the language of the act. Cf. Missouri v. Kansas Gas Co., Public Service Comm. v. Attleboro Steam & Electric Co., Supra. The record shows no ground for setting aside or modifying the order.

The petition for its review is denied.

WALLER, Circuit Judge (dissenting).

In order to set out my views more clearly on this controversy I shall state some facts in addition to those set forth in the main opinion.

Petitioner owns 110 producing gas wells and controls 56,555 acres of natural gas lands in the Monroe Gas Field of Louisiana. It gathers the gas from its wells and also that which it buys from other wells, and, through its own pipe lines, transports same to points within the State of Louisiana and within the Monroe Gas Field, where it is delivered to interstate pipe line companies which in turn transport the gas to individual customers and to utilities in other states which then sell the gas to the ultimate consumer. It is the price received in Louisiana for gas, produced in Louisiana, gathered in Louisiana, sold in Louisiana, delivered in Louisiana, and to which all right, title, and interest passes in Louisiana, that the Commission has fixed in the order here under review.

Before the gas is transported by the interstate pipe line companies it is first compressed, and its continuous transmission is thus temporarily arrested as it is made ready for its journey in interstate transportation.

Petitioner, of course, knows that the gas which it produces, gathers, and sells will be transported by the purchasers in interstate commerce by whom it will be sold directly to the ultimate consumers or to the owners of distribution systems who will, in turn, sell it to ultimate consumers, in other states.

In another phase of Petitioner's business it transports and sells some of its gas to points in Louisiana by a pipe line, which, however, runs through a portion of the State of Mississippi. This activity is definitely in interstate commerce, regulable, and regulated, by the Commission, but it, admittedly, is not in issue here. The appeal is from the order of the Commission reducing the selling price in Louisiana of Petitioner's gas to certain interstate pipe line companies from 7.39¢ to 4.66¢ per thousand cubic feet.

Petitioner is in no wise affiliated with any of these purchasers of its gas, as was the situation in Peoples Natural Gas Co. v. Federal Power Commission, 75 U.S.App. D.C. 235, 127 F.2d 153, and in Illinois Gas Co. v. Public Service Co., 314 U.S. 498, 62 S.Ct. 384, 86 L.Ed. 371. In neither of those cases was the Appellant a producer of natural gas as is Petitioner in the case at bar.

The Act by its terms applies: (1) To transportation in interstate commerce of natural gas; (2) to the sale of natural gas in interstate commerce for resale for ultimate public consumption; and (3) to natural gas companies engaged in interstate transportation or sale of natural gas.

In Phillips Petroleum Co. v. Ochsner, 5 Cir., 146 F.2d 138, 139, this Court [footnote 1] noted that under the natural gas contracts in force in the Panhandle Gas Field of Texas "the producer is required to gather the gas at the well and deliver it into the main pipe line of the pipe line company under certain required pressures, * * *." In the present case, Petitioner gathers and delivers its gas to the interstate pipe lines.

It seems that the gathering, and transporting to market, are necessary incidents to the production of gas, for there can be

no sustained production unless the gas can be collected and carried to market. "Transportation and sale do not include production or gathering." Colorado Interstate Co. v. Federal Power Commission, 324 U.S. 581, text 598, 65 S.Ct. 829, 837, 89 L.Ed. 1206.

Congress refused in the Act to confer upon the Federal Power Commission the right to regulate the production, or the power to regulate the gathering, of natural gas. The view seems to be quite reasonable that it did not undertake to regulate the gathering of natural gas because it, doubtless, recognized that gathering was a necessary incident to production—a purely local activity. We do not have here a case where the producer is admittedly regulable, whose producing and gathering facilities must be taken into account in the over-all pattern of rate making, as in Colorado Interstate Co. v. Federal Power Commission, supra.

Without doubt, had Congress desired to exercise the full extent of its power in the regulation of interstate commerce in natural gas, it could have empowered the Commission to regulate, as isolated activities, also the production and gathering of natural gas when same is produced or gathered with knowledge that sale, shipment, and delivery in interstate commerce was intended, as it did, for example, in Sec. 15(a) (1) of the Fair Labor Standards Act, Sec. 215(a) (1), Title 29 U.S.C.A. Congress could easily have given the Act a broader scope by conferring the power upon the Commission to regulate any operation or movement of natural gas which might retard its commercial or industrial use, or which might otherwise adversely affect interstate commerce. It could have made the Act applicable to any facilities that *affect* interstate transportation as in the Federal Employers' Liability and Interstate Commerce Commission Acts, 45 U.S.C.A. § 51 et seq., and 49 U.S.C.A. § 1 et seq. It could have defined interstate commerce in natural gas so as to include the production, or the gathering, of natural gas for commerce to the same purpose and extent as was done in the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., wherein "goods produced for commerce" were placed within the coverage of the Act. Instead of doing that, Congress expressly stated that the provisions of the chapter should be applicable only to three specific situations, viz., the transportation in interstate commerce, the sale in interstate commerce for resale for ultimate public consumption, and to natural gas companies engaged in such transportation or sale. After outlining the scope of the Commission's power, Congress then set out the restrictive enactment that the Act should not apply to any other transportation or sale of natural gas nor to the local distribution of natural gas, nor the facilities used for such local distribution, nor to the production or gathering of natural gas. The Act cannot be applicable to the production and gathering of natural gas except as the valuation of its producing and gathering facilities are inherently a part of the value that must be taken into consideration in regulating rates of natural gas companies engaged in transportation and sale of gas in interstate commerce.

What is meant by a "sale in interstate commerce"? The Act contains its own definition, and there is no occasion for the Court to invent one. This feature of the Act does not appear to have received attention in the majority opinion nor in Peoples Natural Gas Co. v. Federal Power Commission, supra, nor in Illinois Gas Co. v. Public Service Co., supra. Sec. 717a (7), Title 15 U.S.C.A., defines "interstate commerce" to mean "commerce between any point in a State and any point outside thereof, or between points within the same State but through any place outside thereof, * * *." This unapplied definition presents the main point of divergence between my views and those of the majority. The sale made by the Petitioner here was not between any point in the State of Louisiana and any point outside of Louisiana. It was not a contract of sale made in Louisiana with delivery of the commodity to be in another state. The sale was made and the title passed in Louisiana. Petitioner had no further right, title, interest, or concern in such gas after the delivery to the purchaser. Nor did its interstate pipe line purchaser have any further obligation to Petitioner to carry or to safely deliver, the gas which Petitioner had delivered to

it. There was no continuity of responsibility or liability for the subsequent and safe carriage of the gas as is the case in ordinary movements of commodities in interstate commerce. Petitioner had no interest in what happened to the gas after its delivery to purchaser. Delivery, which is an element of every sale, was completed within the Monroe Gas Field in Louisiana without the use of any facilities of interstate commerce. I can see no sale in interstate commerce, as defined by the Act, made by the Petitioner. True, it made a sale with knowledge that the gas was intended to be transported and sold by its purchaser in interstate commerce, but that is not a sale by it in interstate commerce within the coverage of the Act.

What is meant by "transportation in interstate commerce"? Under the definition of interstate commerce in the Act it can only mean the transportation from a point in Louisiana to a point outside that state in the carriage of natural gas. Petitioner is not a carrier of gas for hire such as would characterize it as a part of an interstate system of interstate transportation. Its function is analogous to that of a tram road, or dummy line, of a saw mill that locally hauls its own lumber to the common carrier.

The language of the Act that the provisions of this chapter shall apply "to natural-gas companies engaged in such transportation or sale," does not sustain the Commission's contention in the present case because the Petitioner does not sell nor transport the gas, upon which the price is sought to be regulated, except in the State of Louisiana and, therefore, is not a natural gas company under the definition in Sec. 717a(6), Title U.S.C.A.[1] The "sale of natural gas in interstate commerce for resale" means a sale, calling for delivery across state lines, to a purchaser which resells to the ultimate consumer, as, for instance, a sale by a pipe line customer of Petitioner in Louisiana to the owner of a gas distribution system in Memphis who will in turn resell it to its consumers.

It seems to require an artificial conjoining of phrases, or verbal manipulation, to place into the Act this interpretation by the majority:

[The Act] "should not apply 'to the facilities used for such (i. e. local) distribution or to the production or gathering of natural gas'."

The language of the Act is not that it shall not apply to "*the facilities* used for the production or gathering of natural gas", but that it "shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or *to the production or gathering of* natural gas." "The facilities *used to* the production or *to* the gathering of natural gas" would be such an unusual or odd expression that it ought not to be ascribed to Congress. The term "facilities" can only refer to the facilities used in the local distribution of gas in cities and towns. I am unable to accept the view that the Act merely withheld from the Commission "jurisdiction over properties" or facilities of producers and gatherers.

The construction of the Act given to it by the Power Commission and the majority of this Court appears to nullify the plain intent of Congress to except from the operation of the Act the production and the gathering of gas when the producer, gatherer, and the seller, neither transports nor sells gas in interstate commerce, and when the Act nowhere gives the Commission jurisdiction to regulate the production or the gathering and intrastate transportation of gas merely because producer or seller or gatherer knows that the purchaser of such gas will in turn transport it in interstate commerce and sell it in another state chiefly to those who will there resell it to the ultimate consumer.

Congress had the power to have regulated both the production and the intrastate gathering of natural gas when produced and gathered with knowledge that it would be transported or sold in interstate commerce in the same fashion that

---

[1] "'Natural-gas company' means a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale." Sec. 717a(6), Title 15 U. S.C.A.

it did in the Fair Labor Standards Act. But in the present Act Congress wholly failed to take over the regulation of these two phases of the industry, and, in the face of the statute and in the absence of appropriate legislation they must be deemed to be only local activities.

Natural gas must be transported to market to the same extent as any other commercial production. The gathering and transporting of gas to a place of sale is as essential to the production of gas as is the drilling of a gas well. Regulation of the production of natural gas is forbidden, but if the Commission is given the power to regulate the price which the producer and gatherer receives at the end of the intrastate journey at the pipe line of the interstate purchaser, it is also given the power to regulate production. If the price which the producer and gatherer gets for the gas which he has produced and gathered is less than it costs to produce it, production will be thereby regulated indirectly, but, withal, as effectively as if Congress had expressly conferred such authority upon the Commission.

The custom in the industry is for the producer to bring his gas to the interstate pipe line for market. Here the market was within the same gas field, and within the same State, in which the gas was produced and gathered. The farmer, for instance, who produces cotton transports it to market where, let us assume, he has previously agreed to sell it to a New England cotton mill. He produced, gathered, and transported that cotton to market in Louisiana and even though he knew that the cotton was to be shipped to New England, he would not be engaged in the transportation or sale of cotton in interstate commerce, and, therefore, regulable, unless Congress had declared otherwise. Congress has the power to regulate enterprises which, in isolation, are purely local, provided such enterprises are determined by Congress to substantially affect interstate commerce or the free flow of goods in commerce. This Congress did not attempt to do in the statute under consideration.

Believing that courts should construe statutes instead of making them, I am unwilling to participate in writing into the Act that which Congress expressly under-

took to keep out, even if by so doing a better statute would result.

On Motion for Rehearing.

PER CURIAM.

Neither of the judges who concurred in the decision of this case being in favor of a rehearing, it is ordered that the motion therefor be overruled and denied.

WALLER, Circuit Judge, dissents.