**DEEP SOUTH OIL COMPANY OF TEXAS, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent.**

No. 15849.

United States Court of Appeals Fifth Circuit.

June 29, 1957.

Dissenting Opinion July 30, 1957.

Newell Ellison, Washington, D. C., John Ben Shepperd, Atty. Gen., Tex., Richard L. Fruchterman, New York City, Harold M. Willcox, Washington, D. C., Roland C. Kizer, Baton Rouge, La., Hugh B. Cox, Washington, D. C., for Deep South Oil Co. of Texas. Kizer, Heaton, Craig & Cangelosi, Baton Rouge, La., Covington & Burling, Washington, D. C., of counsel.

Robert L. Russell, David S. Lichtenstein, William L. Ellis, Attys., Willard W. Gatchell, Gen. Counsel, F. P. C., Washington, D. C., Mert Starnes, Asst. Atty. Gen. of Texas, amicus curiae.

Before BORAH, RIVES and BROWN, Circuit Judges.

BORAH, Circuit Judge.

This case comes to us on the petition of Deep South Oil Company of Texas to review, pursuant to Section 19(b) of the Natural Gas Act,[1] an order of the Federal Power Commission determining that Deep South is a "natural-gas company" as that term is defined in the Act.[2]

1. 15 U.S.C.A. § 717r(b).
2. By Section 2(6) of the National Gas Act "natural-gas company" is defined to mean "a person engaged in the trans-

Deep South is a small, unintegrated corporation engaged in the exploration for and the production of oil and gas. Its properties are located in the State of Texas, and its oil and gas facilities consist only of oil and gas well equipment, including flow lines, heaters and separators, together with such valves, tanks, and meters as are required for the operation of its wells and .lines. As revealed by the record before us, Deep South owns or has an interest in and operates fourteen wells in the Big Hill Field located in Jefferson County, Texas. Five of these wells produce "casinghead gas"[3] and nine produce "full stream" or "gas well gas,"[4] and all of the gas from these wells which is not used in the field for drilling purposes by Deep South or other operators is sold to Texas Gas Corporation pursuant to a contract which was executed on February 15, 1952, for a term of twenty years. This agreement by its terms provides that the leases and lands which Deep South owns or acquires in the Big Hill area are "dedicated" to the performance of the contract, and that the gas shall be delivered at each of Deep South's wells located on the dedicated leases in a full stream, *in its natural state, without the extraction therefrom of any gasoline or other liquefiable hydrocarbons.*[5] Prior to delivery under the contract, the "casinghead gas" is separated from the oil with which it is produced at a field separator, and the "full stream gas" is treated for the removal of water at a so-called "freewater knockout." Within a few feet from the point at which the gas leaves the aforementioned mechanical devices, it passes into Texas Gas' me-

ters which are located on the leases near the wellheads from which the gas is produced. There it is measured and delivered and title thereto passes to Texas Gas. Thereupon the gas then moves from these metering points through a network of converging pipelines of progressively larger size to the purchaser's processing plant at Winnie, Texas, which is located about seven miles from the Deep South leases. During the course of this movement, the gas purchased from Deep South is commingled in the pipelines with gas which Texas Gas has purchased from other operators in the area. At the Winnie processing plant all of the casinghead gas and gas well gas purchased by Texas Gas is processed for removal of water vapor and liquefiable hydrocarbons. After processing, the gas is discharged into a common sales header and pursuant to a contract between Texas Gas and Texas Eastern Transmission Corporation a portion of such gas flows into the latter's interstate transmission lines for transportation and resale in interstate commerce. This contract between Texas Gas and the pipeline company is for a minimum of fifteen years and by its terms the gas purchase contract between Deep South and Texas Gas and the gas which may be produced from the lands and leaseholds covered thereby are "dedicated" to the performance of the contract between Texas Gas and Texas Eastern.

The proceeding before the Commission which gave rise to this petition for review was initiated by Deep South when, in conformity with Rule 1.7(c) of the Commission's Rules of Practice and Procedure, it filed a petition for a decla-

portation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale." 15 U.S. C.A. § 717a(6).

3. "Casinghead gas" is gas that is produced along with oil from an oil well and ordinarily consists of fixed gases, principally methane in bulk, with other hydrocarbons ranging from the lighter ones down to the quite heavy ones. Mixed with those hydrocarbons are water vapor, acid gases, hydrogen sulphide and

carbon dioxide, in addition to other fairly common diluents such as nitrogen, helium, and various sulphur compounds, and impurities such as drilling mud, rust, sand and dirt.

4. "Full stream gas wells," "straight gas wells," and "gas distillate wells" are synonymous terms and the gas produced therefrom is "gas well gas," which contains fewer liquifiable hydrocarbons than gas produced in association with oil.

5. All italics herein ours.

ratory order [6] in which it requested the Commission to declare that petitioner's sales of natural gas to Texas Gas are not subject to regulation under the Natural Gas Act, 15 U.S.C.A. §§ 717–717w, and that petitioner is not a "natural-gas company" within the meaning of the Act or subject to the provisions of the Commission's Order No. 174–A.[7] This proceeding, Commission's Docket No. G–2952, was consolidated for the purposes of hearing with proceedings on two similar petitions filed by Shell Oil Company and Humble Oil & Refining Company, Commissioner's Docket Nos. G–4671 and G–5261, respectively. After a hearing and upon the facts of record, the presiding examiner decided that petitioners' sales of gas, and each of them, were sales in interstate commerce of natural gas for resale within the purview of the Natural Gas Act, and that by reasons of such sales, each of the petitioners was a "natural-gas company" subject to regulation under the provisions of the Act. Accordingly, petitioners' respective prayers for declaratory relief were denied.

Deep South, Shell, and Humble Oil thereupon filed exceptions to the decision of the presiding examiner and the Commission, after hearing oral argument thereon, issued on September 9, 1955, its Opinion No. 284 and accompanying order affirming the decision of the examiner for the reasons therein stated. In its opinion the Commission noticed the fact that these consolidated proceedings presented to it for the first time the question whether sales of natural gas made before the completion of "production and gathering" are exempt from the Natural Gas Act by reason of the exclusionary provision of Section 1(b) of the Act. In resolving this question the Commission rejected petitioners' claims that "casinghead gas" is not "natural gas" within the meaning of the Act, and expressly affirmed the examiner's conclusion that there is nothing in the Natural Gas Act which supports petitioners' assertion that regulation under the Act is confined to fuel gas which consists "almost entirely of methane and ethane." Likewise, the Commission concluded that there was no merit in the contention that the sales in question are for "manufacture" and not for "resale." And, on the basis of its finding that the entire movement of the gas from the producing wells through the processing plants to consumers in other states is an uninterrupted and continuous flow, the Commission determined that the gas which is sold by petitioners is sold "in interstate commerce." Finally, the Commission concluded that none of the sales is exempt from regulation under the Act for the reason that the exemptive language of Section 1(b) does not nullify the clear and specific grant of jurisdiction over "sales of natural gas in interstate commerce for resale." Thereafter and agreeable to the provisions of Section 19(a) of the Act, petitioners filed applications for rehearing of this order, which applications were on November 4, 1955, denied by order of the Commission. Whereupon, Deep South, Shell, and Humble Oil, each filed a petition for review,[8]

6. In its amended and supplemental petition Deep South sought declaratory relief from the Commission with respect to a sale made from a single gas well in Refugio County, Texas. Subsequent to the hearing before the presiding examiner this well became exhausted, the equipment was dismantled and all deliveries of gas from the well discontinued. For that reason, Deep South withdrew its request for relief with respect to this well, the withdrawal being made at the time of the argument before the Commission. The Commission's opinion and order contain references to this well, but the questions relating to it are now moot

and are not referred to in Deep South's petition for review or discussed in its brief.

7. See Magnolia Petroleum Company v. Federal Power Commission, 5 Cir., 236 F.2d 785, certiorari denied 352 U.S. 968, 77 S.Ct. 356, 1 L.Ed.2d 322, for a discussion of Order No. 174–A.

8. Shell Oil Company's petition for review has been docketed as cause No. 15,900 and Humble Oil & Refining company's petition has been docketed as cause No. 15,884. The three cases were consolidated for purposes of argument and submission by order of Court entered June

praying that the orders of September 9 and November 4, 1955, be set aside in their entirety and that this Court further determine and declare that petitioner is not a "natural-gas company" within the meaning of the Act and that its sales are not subject to the jurisdiction of the Commission.

In this review proceeding as in the proceeding which was had before the Commission, Deep South raises two issues. The first and principal point urged is that the sales made by it are not within the specific affirmative grant of jurisdiction to the Commission over sales "in" interstate commerce for the reason that all of the relevant circumstances establish that they are "local" in character. We do not agree. In our opinion the statutory language, its legislative history and prior decisions of the Supreme Court compel a contrary conclusion. When the Act was passed in 1938, Congress declared the national policy in doing so as follows:

"Section 1. (a) As disclosed in reports of the Federal Trade Commission made pursuant to S.R. 83 (Seventieth Congress, first session) and other reports made pursuant to the authority of Congress, it is hereby declared that the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest, and that Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest."

In the hearings which were had before the House Committee on Interstate and Foreign Commerce prior to the adoption of the Act, Congress was fully informed as to the need for such regulation and among other considerations it was cognizant of the fact that the prices at which local distributing companies can sell gas are in very large part determined by the prices they are required to pay for the same to interstate pipeline companies. It was strongly urged to Congress that the public cannot be protected from exploitation in the prices charged for natural gas unless Government shall control not only the price charged by the companies which deliver the gas to the consumer, but also the prices of all companies which cooperate in bringing the gas from the wells in the state of production to the utimate consumer in the state of distribution.[9] The Committee reports on the bill which became the Natural Gas Act specifically stated that "sales for resale, or so-called wholesale sales in interstate commerce *(for example, sales by producing companies to distributing companies)* * * * have been considered [by the courts] to be *not local in character,* and even in the absence of Congressional action not subject to State regulation."[10] Accordingly, Congress provided in Section 1(b) of the Act the following:

*"The provisions of this act shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption* * * * *and to natural-gas companies engaged in such transportation or sale,* but shall not apply to any other transportation or sale of natural gas * * * or to the production or gathering of natural gas."

"Natural gas" is defined in Section 2 (5) of the Act to mean "either natural gas unmixed, or any mixture of natural and artificial gas," and in Section 2(7) "interstate commerce" is defined as commerce between any point in a State and any point outside thereof, or between points within the same State but through

25, 1956, however, separate opinions and judgments will be filed and entered in each case. See 247 F.2d 900, 903.

9. Hearings before House Committee on Interstate and Foreign Commerce on H.R. 4008, 75th Cong., 1st Sess. p. 142.

10. H.R.Rep. No. 709, 75th Cong., 1st Sess., 1–2; S.Rep.No. 1162, 75th Cong., 1st Sess., 1–2.

any place outside thereof, but only insofar as such commerce takes place within the United States."

In numerous decisions, the Supreme Court has recognized that the Act was primarily designed to protect consumer interests against exploitation at the hands of private natural gas companies, and with particular reference to sales by independent producers the Court, in Phillips Petroleum Co. v. State of Wisconsin, 347 U.S. 672, 682, 74 S.Ct. 794, 799, 98 L.Ed. 1035, said:

> " * * * we believe that the legislative history indicates a congressional intent to give the Commission jurisdiction over the rates of all wholesales of natural gas in interstate commerce, whether by a pipeline company or not and whether occurring before, during, or after transmission by an interstate pipeline company."

And in emphasizing the purpose of the Natural Gas Act to protect consumers, the Court at page 685 of 347 U.S., at page 800 of 74 S.Ct. observed that:

> "Regulation of the sales in interstate commerce for resale made by a so-called independent natural-gas producer is not essentially different from regulation of such sales when made by an affiliate of an interstate pipeline company. In both cases, the rates charged may have a direct and substantial effect on the price paid by the ultimate consumers. Protection of consumers against exploitation at the hands of natural-gas companies was the primary aim of the Natural Gas Act. Federal Power Commission v. Hope Natural Gas Co., supra, 320 U.S. [591] at page 610, 64 S.Ct. [281] at page 291 [88 L.Ed. 333]. Attempts to weaken this protection by amendatory legislation exempting independent natural-gas producers from federal regulation have repeatedly failed, and we refuse to achieve the same result by a strained interpretation of the existing statutory language."

Having in mind the obvious purpose of Congress which was to see that there was effective regulation of all interstate wholesale sales of natural gas, it would be an exceedingly incongruous result if a statute so motivated and planned to bring about such regulation were construed so as to obtain the opposite result. To hold, as petitioner would have us do, that it may set up its own interests in complete freedom from regulation of the price of its wholesale sales would be to permit it, if it were so inclined, to engage in the every exploitation which the Act was designed to prevent. We cannot therefore subscribe to the view that the Act contemplates that petitioner or any other independent producer should be free of price regulation, if it is engaged in the sale in interstate commerce of natural gas for resale.

 As to petitioner's claim that its sales are "local" in character, we think it plain that they are sales "in interstate commerce" for the obvious reason that the sale of gas originating in one state and its transmission and delivery to distributors in any other state constitutes interstate commerce. Federal Power Commission v. National Gas Pipeline Company of America, 315 U.S. 575, 582, 62 S.Ct. 736, 86 L.Ed. 1037. Cf. Federal Power Commission v. East Ohio Gas Co., 338 U.S. 464, 467, 70 S.Ct. 266, 94 L.Ed. 268. The fact that the sales are made at the wellhead is immaterial for the particular point at which the title and custody of the gas pass to the purchaser, without arresting its movement to the ultimate interstate destination, does not affect the essential interstate nature of the business. Illinois Natural Gas Co. v. Central Illinois Public Service Co., 314 U.S. 498, 503–504, 62 S.Ct. 384, 86 L.Ed. 371. Here, petitioner's own brief testifies eloquently to the continuous movement of the gas which it sells at the wellhead. Petitioner admits, as, of course, it must, "that there is a continuous flow of gas from the Deep South wells into the gathering system of Texas Gas; that the

mass of gas of which the Deep South gas becomes a part moves continuously through the gathering system into a processing plant; that the movement through the processing plant is continuous; that there is a continuous movement of natural gas from the outlet of the processing plant to both interstate and intrastate destinations. * * * " Accordingly, and in the light of all of the uncontroverted facts, we hold that when the gas was sold by petitioner it had commenced its journey in interstate commerce.

We are likewise no more impressed than was the Commission with the claim that petitioner's sales were made for "manufacture", not for "resale." This contention is made notwithstanding the fact that all of the parties to the contract between Deep South and Texas Gas fully understood that the gas was to be resold in wholesale quantities by the buyer. In the conduct of its business, petitioner sells its gas in bulk to Texas Gas. Texas Gas in turn and at the tailgate of its processing plant resells the gas which it purchases from petitioner to an interstate transmission company for resale, as well as to intrastate customers. The inescapable fact here then is that at least some portion of the gas sold by petitioner is resold to consumers outside the State of Texas. Consequently, there can be no question that petitioner is making sales for resale within the meaning of the Act. Nor is it of significance that the gas in the course of its interstate transmission passes through Texas Gas' processing plant. The processing herein involved is not an interruption of the interstate journey and is not "manufacture." On the contrary, as noted above, the processing does not interrupt the continuous movement of the gas from the wellhead to consumer burner tips and is merely a part of the business of transporting and marketing gas in interstate commerce. City of Detroit, Mich. v. Federal Power Commission, 97 U.S.App.D.C. 260, 230 F.2d 810, 820, certiorari denied Panhandle Eastern Pipe Line Co. v. City of Detroit, 352 U.S. 829, 77 S.Ct. 34, 1 L.

Ed.2d 48. Cf. Cities Service Gas Co. v. Federal Power Commission, 10 Cir., 155 F.2d 694, certiorari denied 329 U.S. 773, 67 S.Ct. 191, 91 L.Ed. 664.

Petitioner also insists that the casinghead gas which it sells is not "natural gas" within the meaning of the Act. For answer we deem it sufficient to say that there is nothing in the general language used in the definition of "natural gas," quoted above, which suggest that a special or narrow or unnatural definition of "natural" was meant. Boone's Petroleum Dictionary (1952) defines natural gas as *a mixture of gaseous hydrocarbons found in nature* in many places connected with deposits of petroleum, to which the gaseous compounds are closely related. The record in this case shows that the principal constituents of natural gas which is used as a domestic or industrial fuel are methane and ethane; that casinghead gas contains methane and ethane, as well as other constituents that are valuable, such as propane, butane, and the heavier components that comprise natural gasoline; and that it is economically desirable to remove these additional components for their value. The gas sold by petitioner contains the methane and ethane which constitutes the bulk of fuel gas distributed to domestic, commercial and industrial consumers. And the extraction process to which the gas is subjected after delivery under the sales contract does not create or add to the product any amount of either of those components. Thus, it is plain that casinghead gas is not any the less "natural" gas because it contains variable amounts of other constituents.

The petitioner alternatively contends, however, that regardless of whether the sales in question are sales in interstate commerce, the transactions fall within the clause of Section 1(b) of the Act which specifically excepts from the Commission's jurisdiction the regulation of " * * * the production or gathering of natural gas." We do not at all agree, but on the contrary think that our observations in Interstate Natural Gas

Company v. Federal Power Commission, 156 F.2d 949, 951, supply a ready answer to this contention. There, in speaking of Section 1(b), we said:

"[The Act] is very simply and plainly written. After stating what it shall apply to, it then states what it shall not apply to. Under familiar rules of construction, a negation in or exception to a statute will be construed so as to avoid nullifying or restricting its apparent principal purpose and the positive provisions made to carry them out. * * * Here the statute was drawn to regulate, it picked out for inclusion 'sale in interstate commerce of natural gas for resale for ultimate public consumption' * * * Unnecessarily perhaps but in the interest of making clear that the act gave jurisdiction only over sales and transportation of the kind described in it, it used language removing from any doubt that the Commission was not to have jurisdiction over properties used for production and local distribution or the activities of production and gathering. It did this by expressly providing that the act should not apply 'to the facilities used for such [i. e. local] distribution or to the production or gathering of natural gas.'"

The exemption of production and gathering merely means that the physical activities, facilities and properties used by petitioner in the production and gathering of natural gas are not within the commission's power of regulation. However, there is nothing in the Act which suggests, either expressly or by implication, that by the exemption of production and gathering, Congress intended that the wholesale sales of natural gas

in interstate commerce which are consummated before the gas has been gathered or processed should not be regarded as sales in such commerce over which the Commission was granted exclusive jurisdiction to regulate.

Petitioner argues, however, that what is involved here is "more than merely regulation of sales," for the reason that our decision herein will give rise to certain hypothetical situations predicated upon assumed future actions by the Commission, viz., that should certificates of public convenience and necessity which petitioner will apply for be refused, Deep South must close its wells and suspend operations, and that petitioner must obtain the Commission's permission before discontinuing sales from a well which has been found subject to Federal jurisdiction. No such issues are presented in the instant case, and it will be time enough to pass upon those issues if and when they are properly presented.

■ In the light of the foregoing it follows that the order of the Commission declaring Deep South Oil Company of Texas to be a "natural-gas company" within the meaning of the Natural Gas Act should be and the same hereby is affirmed.

Affirmed.

JOHN R. BROWN, Circuit Judge.

I dissent for reasons hereafter to be filed.

JOHN R. BROWN, Circuit Judge (dissenting).*

Again, my differences, while substantial are basic and, in this approach, as before, Magnolia Petroleum Co. v. Federal Power Commission, 5 Cir., 236 F.2d 785, at pages 793 to 811, I accept the Court's fair and faithful outline of the cases. Since these cases[1] present the

* Editorial note:
    This opinion was prepared and filed as a separate opinion in each of the following cases: No. 15900, Shell Oil Company v. Federal Power Commission, 247 F.2d 900; No. 15884, Humble Oil & Refining Company v. Federal Power Commission, 247 F.2d 903; No. 16130, Continental Oil Company v. Federal Power Commission, 247 F.2d 904.

1. In 16,130, Continental Oil Company v. Federal Power Commission, 5 Cir., 247 F.2d 904, procedural problems arise and are discussed. I am in agreement with the Court's disposition of these, and

common problem of jurisdiction of the Federal Power Commission over the first sale by an oil-gas-well producer made before production or gathering has ended, I treat them together despite minor variations in factual details.

Likewise, it both simplifies and emphasizes the nature of this problem to concentrate primarily upon the most common transaction[2]—the sale of casinghead gas to a processor who in turn sells residue gas to an interstate pipe line.

In this way we come to see what might otherwise be obscured. The problem really is: What did Congress in 1938 mean by the language of Section 1(b).[3] I purposefully emphasize 1938. For the circumstances of the passage of the Natural Gas Act were so unique that, we are told, "* * * *prior* constitutional decisions, not what we have since decided or would decide today, form the measure of the gap which Congress intended to close by this Act. Illinois Natural Gas Co. v. Central Illinois Public Service Co., 314 U.S. 498, 508, 62 S.Ct. 384, 388, 86 L.Ed. 371 [377]; and see Parker v. Motor Boat Sales, 314 U.S. 244, 250, 62 S.Ct. 221, 225, 86 L.Ed. 184 [191] * * *," Federal Power Commission v. East Ohio Gas Company, 338 U.S. 464, 472, 70 S.Ct. 266, 270, 94 L.Ed. 268, 277.

This refers, of course, to the oft repeated history that Congress legislated to fill the gap created by specific decisions[4] of the Supreme Court. Panhandle Eastern Pipe Line Co. v. Public Service Commission, 332 U.S. 507, 517–519, 68 S.Ct. 190, 92 L.Ed. 128, 137–139.

This has at least a dual significance. First, it makes terribly important just what those cases decided, because it was the decisions which created the gap. And second, as 1938 Congressional preoccupation with the gap is the test, the jurisdictional parts of the Act must be viewed through 1938 lenses. With that outlook, can it be said that Congress knowingly set in train the consequences which flow from these decisions?

The first becomes of some importance in the Court's view because, in the final analysis, the conclusion reached in Deep South rests upon a Committee report[5] and the decision of Phillips Petroleum Company v. State of Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035. The fact is, of course, that neither of the two cases, note 4, supra, dealt even remotely with the sale by a producer in an oil field to a processor who in turn sold to an

---

my differences as to that case relate solely to the basic issue.

2. Deep South to Texas Gas to Texas Eastern.
   Shell to Texas Gas Pipeline to Transcontinental.
   Shell to Phillips to El Paso Natural Gas.
   Humble to Processors to Pipe Line Companies.

3. § 1(b), 15 U.S.C.A. § 717(b):
   "The provisions of this Act shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption * * * and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas * * * or to the production or gathering of natural gas * * *."

4. State of Missouri ex rel. Barrett v. Kansas Natural Gas Co., 265 U.S. 298, 310, 44 S.Ct. 544, 68 L.Ed. 1027, 1031; Public Utilities Commission of Rhode Island v. Attleboro Steam & Electric Co., 273 U.S. 83, 89, 47 S.Ct. 294, 71 L. Ed. 549, 553; and see Pennsylvania Gas Co. v. Public Service Commission, 252 U.S. 23, 40 S.Ct. 279, 64 L.Ed. 434, subsequently repudiated East Ohio Gas Co. v. Tax Commission, 283 U.S. 465, 51 S. Ct. 499, 73 L.Ed. 1171.

5. The Deep South opinion states: "The Committee reports on the bill which became the Natural Gas Act specifically stated that 'sales for resale, or so-called wholesale sales in interstate commerce (for example, sales by producing companies to distributing companies) * * * have been considered [by the courts] to be not local in character, and even in the absence of Congressional action not subject to State regulation.'" H.R.Rep. No. 709, 75th Cong., 1st Sess. 1–2; Senate Rep. No. 1162, 75th Cong., 1st Sess. 1–2.

interstate pipe line. In Attleboro the utility generated and transported electricity; in Kansas the seller to the local distributing company was an integrated producer-transmission pipe line company. So far as Phillips Petroleum Company v. State of Wisconsin, supra, which I accept, is concerned, I hardly think that, with the Court's studied traditional refusal to deliver advisory opinions even on matters which it knows are then somewhere in the judicial mill and which will inevitably come through its own grist, the Supreme Court meant to decide that *all* sales of gas which, because of molecular identity, flow ultimately from Texas or Louisiana to New York are sales in interstate commerce.

This is but another way of saying that we face an entirely new case—one never before decided. The crucial issue here is whether the sales are in interstate commerce as meant by § 1(b). At the outset in Phillips that issue was conceded as "Petitioners admit that Phillips engages in 'the sale in interstate commerce of natural gas for resale', as, of course, they must. Interstate Natural Gas Co. v. Federal Power Comm., 331 U.S. 682, 687–689, 67 S.Ct. 1482, 1485–1487, 91 L.Ed. 1742 [1746–1748]," 347 U.S. 672, at page 677, 74 S.Ct. 794, at page 796, 98 L.Ed. 1035, at page 1045. The second issue involved here is whether these sales are made in the course of production or gathering. The similar contention in Phillips fell by the Court's rejecting the Commission's finding and the plain holding that "We are of the opinion * * * that the finding is without adequate basis in law, and that production and gathering, in the sense that those terms are used in § 1(b), end before the sales by Phillips occur," 347 U.S. 672, 678, 74 S.Ct. 794, 797, 98 L.Ed. 1035, 1045. And certainly Interstate Natural Gas Company v. Federal Power Commission, 331 U.S. 682, 67 S.Ct. 1482, 91 L.Ed. 1742, so heavily relied on in Phillips cannot have remotely decided our case. To Interstate's contention "that the sales to the three pipe line companies are a part of the gathering process and consequently not within the Commission's power of regulation," the court answered positively "By the time the sales are consummated, nothing further in the gathering process remains to be done," 331 U.S. 682, at page 692, 67 S.Ct. 1482, at page 1488, 91 L.Ed. 1742, at page 1749. This case recognizes also that principles of constitutional law and statutory construction are not equated with laws of physics, so that the inquiry is something more than the schoolboy's quest for molecular identification. Concerning the Congressional purpose to leave production and gathering to the States, the Court stated:

"It was the intention of Congress to give the States full freedom in these matters. Thus, where sales, though technically consummated in interstate commerce, are made during the course of production and gathering and are so closely connected with the local incidents of that process as to render rate regulation by the Federal Power Commission inconsistent or a substantial interference with the exercise by the State of its regulatory functions, the jurisdiction of the Federal Power Commission does not attach * * *," 331 U.S. 682, at page 690, 67 S.Ct. 1482, at page 1487, 91 L.Ed. 1742, at page 1748.

So nothing written so far tells us authoritatively what Congress in 1938 meant to do about sales made prior to completion of production and gathering. Did Congress intend to place this under the control of a remote Federal bureau?

I think the consequences of any such holding are so far-flung and so disturbing to the delicate balance in our system of dual sovereignty that, divining the legislative will as is the judicial function, United States v. American Trucking Associations, 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345, 1350, and whether we look at this through 1938 lenses or 1957 bifocals. I cannot believe that Congress in this innocuous way thought that it was remaking the concept of our political economy.

Since it is the fact of *movement* [6]—continuous and almost irrepressible movement—from the time the gas molecule first begins to stir and is once released from the bowels of the earth until consumed at the Brooklyn burner tip—that is the characteristic which to the Court makes this inevitably interstate, the impact has been dramatically described, Heisler v. Thomas Colliery Co., 260 U.S. 245, 259–260, 43 S.Ct. 83, 86, 67 L.Ed. 237, 243:

> "The reach and consequences of the contention repel its acceptance. If the possibility, or indeed certainty, of exportation of a product or article from a state determines it to be in interstate commerce before the commencement of its movement from the state, it would seem to follow that it is in such commerce from the instant of its growth or production, and in the case of coals, as they lie in the ground. The result would be curious. It would nationalize all industries; it would nationalize and withdraw from state jurisdiction and deliver to federal commercial control the fruits of California and the South, the wheat of the West and its meats, the cotton of the South, the shoes of Massachusetts and the woolen industries of other states at the very inception of their production or growth, that is, the fruits unpicked, the cotton and wheat ungathered, hides and flesh of cattle yet 'on the hoof,' wool yet unshorn, and coal yet unmined because they are in varying percentages destined for and surely to be exported to states other than those of their production."

Such a holding withdraws from the states a traditional field for effective regulation of an economic activity of major importance to the general welfare of the state. Specifically, such a holding will forbid state regulation of oil and gas production activities insofar as that state policy is aimed at, or works through, the use of minimum prices.

This is no theoretical acedemic possibility. This is an actual fact of a present doctrine whose applicability is limited only by the ultimate judicial declaration of the earth-ward limits of a jurisdictional sale. As a part of the yet unascertained fallout of the atomic Phillips decision, the Court in Natural Gas Pipeline Company of America v. Panoma Corporation (Natural Gas Pipeline Company of America v. Corporation Commission of the State of Oklahoma), 349 U.S. 44, 75 S.Ct. 576, 99 L.Ed. 866, held that as to sales within the jurisdictional limits of Phillips, the State of Oklahoma was forbidden to apply its otherwise constitutional[7] power to prescribe minimum prices for Oklahoma gas sold or delivered. The Court with brief but awesome finality said:

> "In [these cases] Oklahoma has attempted to fix a minimum price to be paid for natural gas, after its production and gathering has ended, by a company which transports the gas for resale in interstate commerce. We held in Phillips Petroleum Company v. [State of] Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035, that such a sale and transportation cannot be regulated by a State but are subject to the exclusive regulation of the Federal Power Commission. The Phillips case, therefore, controls this one." 349 U.S. 44, at

---

6. The Court's decision of "sale in interstate commerce" is a bootstrap conclusion: it is an interstate sale because of the movement and yet the movement occurs only because of the sale.

7. Apart from the effect of the Natural Gas Act, the predecessor of this very same state order (identical except as to the price) was upheld in Cities Service Gas Company v. Peerless Oil & Gas

Co., 340 U.S. 179, 71 S.Ct. 215, 95 L.Ed. 190, and Phillips Petroleum Company v. State of Oklahoma, 340 U.S. 190, 71 S.Ct. 221, 95 L.Ed. 204. As to these, the Court in Panoma said, "In those cases we were dealing with constitutional questions and not the construction of the Natural Gas Act * * *," 349 U.S. 44, at page 45, 75 S.Ct. 576, 99 L.Ed. 866, at page 867.

pages 44–45, 75 S.Ct. 576, 99 L.Ed. 866, at page 867.

For these purposes it is of slight comfort to these states that, as Panoma plainly said, this was applied to a post-production and gathering sale. For the basis for the decision was the jurisdictional application of the Act. With the inexorable physical characteristic that traces molecules from Permian Basin to Queenstown Heights and joins body, fleece and tail to Mary's ubiquitous fabled lamb, wherever goes F.P.C. jurisdiction, so goes Panoma. There it was *after* gathering. Here it is at the wellhead before gathering is completed. The majority's decision takes us that far. Where can the states go? To the wellside of the Christmas tree? To the bottom of the well?

Wherever it is fixed is not far enough, nor may it ever be. For the thesis of the majority's opinion is to mix Boyles and Phillips law to come up with the startling legal-statutory interpretation law that because gas, once released is in a constant state of movement, that *movement*, from the very moment it first started, is characterized (intra or interstate) by its final destination. This means that if Oklahoma prescribes the price, as has Kansas[8], as a condition precedent to the right of *withdrawal* of this valuable domestic resource, the sale of that gas *out* of the well—by which alone would there ever be production at all—was of necessity *in interstate commerce*, and such sale and the movement of the gas occasioned by it would fall under Panoma.

Of course, I am not saying that this consequence makes the law invalid or unwise. I assume that Congress could within the broad compass of its constitutional powers over commerce do this very thing. But the fact, so often repeated is that "the Natural Gas Act did not envisage federal regulation of the entire natural-gas field to the limit of constitutional power. Rather it contemplated the exercise of federal power as specified in the Act, particularly in that interstate segment which the states were powerless to regulate because of the Commerce Clause of the Federal Constitution. The jurisdiction of the Federal Power Commission was to complement that of the state regulatory bodies. Accordingly, Congress in § 1(b) of the Act not only prescribed the intended reach of the Commission's power, but also specified the areas into which this power was not to extend," Federal Power Commission v. Panhandle Eastern Pipe Line Co., 337 U.S. 498, at pages 502–503, 69 S.Ct. 1251, at page 1255, 93 L.Ed. 1449, at page 1504.

Avowedly using only a portion of its power, is it likely then that Congress meant to go this far? To think so is to attribute to them a collective ignorance of an already well-defined traditional policy in the states to regulate[9], by regulating the price at which oil or gas could be sold, this important business. Indeed, so well recognized was such state policy that, in the setting of those days, it led to the passage of the Connally Hot Oil Act,[10] 15 U.S.C.A. § 715 et seq. This Act gears interstate transportation of oil to

8. Now pending before the Supreme Court with probable jurisdiction noted, 77 S.Ct. 1055, is the action of the Supreme Court of Kansas, Cities Service Gas Company v. State Corporation Commission of Kansas, 180 Kan. 454, 304 P.2d 528, sustaining the action of the state regulatory agency in fixing the wellhead price for withdrawal of gas. Also pending are similar Oklahoma minimum price cases, see Phillips Petroleum Company v. Oklahoma Corporation Commission, Nos. 953–955, 25 U.S.L.W. 3346; Michigan Wisconsin Pipe Line Company v. Corporation Commission of State of Oklahoma, No. 809, 25 U.S.L.W. 3271.

9. As shown by both pre- and post-1938 decisions, these state efforts had met with Federal constitutional approval: Champlin Refining Co. v. Corporation Commission, 1932, 286 U.S. 210, 52 S.Ct. 559, 76 L.Ed. 1062; Railroad Commission of Texas v. Rowan & Nichols Oil Co., 1940, 310 U.S. 573, 60 S.Ct. 1021, 84 L.Ed. 1368; and see, Nebbia v. People of State of New York, 1934, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940.

10. The Act had its origin in the Executive Orders promulgated July 11, 1933 and July 14, 1933, under the National Industrial Recovery Act, 48 Stat. 200, chap. 90, 15 U.S.C.A. § 710(a), and strick-

state regulation. And at least everyone on the outside of a courtroom knows that modern oil-gas conservation programs, preventing waste by limiting production to meet an established market demand,[11] whether they do so directly or indirectly, actually fix prices. And there need be no apology for this. For the welfare of a state whose economy rests substantially on oil and gas has a vital interest in local legislative or governmental means of stabilizing such a business. "That a legitimate local interest is at stake * * * is clear. A state is justifiably concerned with preventing rapid and uneconomic dissipation of one of its chief natural resources," Cities Service Gas Co. v. Peerless Oil & Gas Co., 340 U.S. 179, at page 187, 71 S.Ct. 215, at page 220, 95 L.Ed. 190, at page 202.

Ten cent oil in the early thirties produced, in East Texas as elsewhere, calamity.[12] With this history so fresh in its recollection, indeed, with like contemporary problems so much then a matter for its current consideration, it is beyond my belief to think that Congress thought that, by the innocuous language of § 1 (b), it was letting loose a nascent force which either could, or would, or might completely alter a major business or thwart a major field of state regulation.

Chief Justice Vinson, recognizing in Interstate Natural Gas Company v. Federal Power Commission, 331 U.S. 682, at page 690, 67 S.Ct. 1482, at page 1487, 91 L.Ed. 1742, 1748, supra, that some sales "technically consummated in interstate commerce * * * are so closely connected with * * * local incidents * * * as to render rate regulation by the Federal Power Commission inconsistent or a substantial interference with the exercise by the State of its regulatory functions, [and] the jurisdiction of the Federal Power Commission does not attach," showed great prescience.

Especially so, if, for example, the current holding and contention of the Federal Power Commission is followed[13] that the price for which independent producers may sell their gas to a pipe line is controlled by City of Detroit, Mich. v. Federal Power Commission, 97 U.S. App.D.C. 260, 230 F.2d 810, certiorari denied Panhandle Eastern Pipe Line Co. v. City of Detroit, 352 U.S. 829, 77 S.Ct. 34, 1 L.Ed.2d 48. That case, with its emphasis on cost data as a part of a so-called rate base, points out that if a "fair-field" price is to be justified it can be so only when it does not produce more than reasonably necessary to permit continued exploration for and development of gas reserves. That, in the light of the oft-repeated statement that "Protection of consumers against exploitation at the hands of natural-gas companies was the primary aim of the Natural Gas Act," Phillips Petroleum Company v. State of Wisconsin, 347 U.S. 672, at page 685, 74 S.Ct. 794, at page 800, 98 L.Ed. 1035,

en down in the celebrated case of Panama Refining Company v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446; see United States v. Gilliland, 312 U.S. 86, 94, 61 S.Ct. 518, 85 L.Ed. 598, 604. "The purpose of the Connally Act * * * is to aid the states in enforcing laws limiting the amount of oil permitted to be produced from wells in designated fields, by prohibiting shipment of excess oil produced * * *," President of United States v. Skeen, 5 Cir., 118 F.2d 58, 59.

11. That this takes collective action of the interested oil-gas producing states is reflected by Congressional approval of the creation and activities of the Interstate Oil and Gas Compact, see Interstate Compact to Conserve Oil and Gas, Aug. 27, 1935, c. 781, 49 Stat. 939, Extensions Aug. 10, 1937, c. 572, 50 Stat. 617; July 20, 1939, c. 337, 53 Stat. 1071; August 21, 1941, c. 400, 55 Stat. 666; July 7, 1943, c. 194, 57 Stat. 383; Interstate Oil and Gas Compact Joint Resolution, Aug. 28, 1951, c. 350, 65 Stat. 199.

12. It led to what the Governor of Texas considered insurrection requiring declaration of martial law as recently enacted conservation laws were enjoined by Federal Courts. Sterling v. Constantin, 287 U.S. 378, 53 S.Ct. 190, 77 L.Ed. 375.

13. We now have nine such cases pending on petition for review from the Federal Power Commission.

at page 1049, may mean that it is the positive duty of the Federal Power Commission aggressively to demand and then approve only the *lowest* rate. But the rate which is most favorable to consumers in Brooklyn, i. e., the *lowest* possible one, may run counter to, and could frustrate altogether, the domestic policy of Oklahoma,[14] or Kansas, or Texas, or New Mexico.

Again, I repeat, Congress could surely make the one subject to the other. But the question remains: where do we find a declaration of any such far-reaching purpose?

The holding of a jurisdictional sale at the wellhead does more than prohibit, and thus invade, state regulation. It affirmatively imposed substantial obligations of the most awesome kind which, although appropriate to utility regulation and within the conceded constitutional power of Congress, could hardly have been anticipated by Congress for application to a person engaged in the local activity of drilling and bringing in an oil or gas well. Here, we see that we cannot brush this aside, as does the majority as mere pessimistic hypothetical prophesies.[15] Holding, as the Court does, that jurisdiction exists, that holding itself sets in train a whole series of requirements which makes it plain that when the wildcatter spudded in, he may have thought himself a free enterpriser in the American tradition, but when the well comes in and the gas is sold to a person who sells it to another who sells it to a pipe line who transports it to a distributing company who sells it to a homeowner, he has become a public utility.

For the Court to say "no such issues are presented in the instant case, and it will be time enough to pass upon those issues if and when they are properly presented" is to forget so soon what we struggled with a year ago in Magnolia Petroleum Company v. Federal Power Commission, 5 Cir., 236 F.2d 785, certiorari denied 352 U.S. 968, 77 S.Ct. 356, 1 L.Ed.2d 322, and the related cases where the series 174, 174A, 174B Order[16] cases were under review. Not here concerned with the validity of those regulations and accepting them for what they state, these regulations with their injunctive and criminal sanctions under

14. In Cities Service Gas Co. v. Peerless, supra, 340 U.S. at page 183, 71 S.Ct. at page 218, 95 L.Ed. at page 200, the Court pointed out that the Oklahoma " * * * Commission concluded that there was no competitive market for gas in the Guymon-Hugoton Field, that the integrated well and pipe-line owners were able to dictate the prices paid to producers without pipe-line outlets, and that as a result gas was being taken from the field at a price below its economic value. It further concluded that the taking of gas at the prevailing prices resulted in both economic and physical waste of gas * * *."

If long-line transmission pipe-lines by mere location and availability have that monopolistic power to drive down prices, what will their power be when, acquiring as a new and somewhat unusual ally, the Federal Power Commission, the two move jointly together to drive prices down further in the name of consumer public interest? What does Oklahoma do in the meantime? What happens to its landowner royalty owners, its oil companies, its banks, its public treasury?

15. In Deep South, the Court says: "Petitioner argues, however, that what is involved here is 'more than merely regulation of sales,' for the reason that our decision herein will give rise to certain hypothetical situations predicated upon assumed future actions by the Commission, viz., that should certificates of public convenience and necessity which petitioner will apply for be refused, Deep South must close its wells and suspend operations, and that petitioner must obtain the Commission's permission before discontinuing sales from a well which has been found subject to Federal jurisdiction. No such issues are presented in the instant case, and it will be time enough to pass upon those issues if and when they are properly presented."

16. See my dissent, Magnolia Petroleum Company v. Federal Power Commission, 236 F.2d 785, at page 793, especially Part I, page 797 through 808, which sets forth these regulations and describes their operation in detail.

Sections 20, 21(a), 15 U.S.C.A. § 717s, § 717t(a), compel definitive action. They compel it now. Noncompliance subjects the independent producer to penalties now. Under Section 157.23(a) the Order requires an application for certificate of public convenience and necessity and, once obtained with service performed, Section 157.28 forbids abandonment of any. sale or service without the express permission and approval of the Commission, J. M. Huber Corporation v. Federal Power Commission, 3 Cir., 236 F.2d 550, certiorari denied 352 U.S. 971, 77 S.Ct. 363, 1 L.Ed.2d 324.

For an industry which has been built upon the inveterate, irrepressible, sometimes flamboyant, optimism of people anxious to take great risks to reap great rewards, suddenly to make out of it the staid and conservative business of a public utility, represents such a radical abandonment of the past that I cannot believe that Congress meant to do this to the thousands who annually bring, or try to bring, or hope to bring, in gas and oil wells. Especially is this so since the making of the very first sale which allows a molecule to make an interstate journey subjects that operator permanently to the jurisdiction of a remote agency until he can prove himself entitled to be freed. Even more so since those very same Orders prescribe that he cannot make any changes in the price which he is willing to sell his gas without first filing, as required under Section 154.92(a), a rate schedule and proving his right to it. And that very same Order, Section 154.94, as does the consistent administrative practice of the Commission, forbids either the use or application of automatic contract step-up rate escalation clauses. The operation of these Orders in the context of the Act under Sections 4 and 5, 15 U.S.C.A. §§ 717c, 717d, exposes the operator to the possibility of an irretrievable loss by suspension for the maximum period of five months, Humble Oil & Refining Co. v. Federal Power Commission, 5 Cir., 244 F.2d 315 [7 cases]; Sun Oil Company v. Federal Power Commission, 5 Cir., 244 F.2d 77. They subject the operator to the burden of proving as just and reasonable any proposed increase. And they expose him all the time to the likelihood that under Section 5 the Commission may determine that what he and his purchaser have agreed to, either in initial rates or those subsequently filed and approved, now produces an unjust and unreasonable rate which can no longer be collected.

I would think that when the Congress sets out radically to change a local free enterprise business[17] to that of a regulated utility, it would do so in unmistakable terms. I would think that it would not only say so, but prescribe as well adequate machinery[18] for the fulfillment

17. As of December 31, 1954, there were 511,200 producing wells. During 1954, in addition to 29,773 oil wells and 19,169 dry holes, 3,977 gas wells were brought in. Statistical Abstract of the United States 1956, page 741.

18. To those of us dealing with these cases since the Phillips decision, the effort of the Commission and its overburdened staff to assimilate and handle the thousands of applications for certificates of public convenience and necessity, for rate increases, etc., can evoke only the most sympathic appreciation for a problem for which it was not equipped by Congress. In October 1954 there were some 2,100 rate filings with 9,702 being received in January 1955.

Of more fundamental significance than the Congressional omission of the working tools (an adequate staff and budget) is the complete failure to prescribe the tools of substance, i. e., the standards to be applied for utility rate making in this field. The Commission immediately recognized this by its Order instituting Docket R-142 under the revealing Heading of "Consideration of principles and Methods to be Applied in the Fixing of Rates to be Charged by Independent Producers for Natural Gas Sold in Interstate Commerce for Resale" which stated:

"2. Necessary to a determination of the rates permitted by the Natural Gas Act to be made, demanded or received by a natural-gas company is the choice of methods to be used in determining the just and reasonable rate for any particular sale. The Commission, recognizing the basic differences between the operations of a producer and those of a pipe-line company, is desirous of securing

of such an undertaking. I would have thought that such a spectacular purpose would be soon evident and would not take eighteen years to discern.

In this analysis I have cencentrated upon the searching out of Congressional intent. In that process, I think the so-called specific exemption of production and gathering is to be read as a part of § 1(b) and not treated as though it stood alone. In that process, also, there are other aids advanced by the parties

which point significantly in this direction.

At the outset it is significant that this is an *"in* interstate" commerce Act not one *"affecting"* [19] interstate commerce. The test then is not how much Congress covered, but rather how much of a field which it deliberately limited did it intend to cover. Federal Trade Commission v. Bunte Bros., Inc., 312 U.S. 349, 61 S.Ct. 580, 85 L.Ed. 881. The legislative history[20] indicates that the "in

any information, suggestions or proposals bearing upon the possible effect the several approaches might have upon the public interests towards which the Natural Gas Act is directed.

"3. The Commission, therefore, is inviting the submission of suggestions as to the principles and methods to be applied by it in its regulation of the rates to be charged by independent producers for the transportation of sale of natural gas subject to the jurisdiction of the Commission. * * *

"4. This is a matter of national importance and the Commission invites members of the industry, producers, gatherers, interstate pipe-line companies, distributors, consumers, groups and associations representative thereof, State commissions, municipalities, and any other interested persons to submit information, data, views, comments or suggestions in writing concerning the problem.
* * * "

But the hearing could hardly supply what the statute omitted, so it was not surprised that after hearings in R-142 scheduled in December 1954 and held at various times in 1955, the Commission by order December 1, 1955, terminated R–142 with this significant finding:

" * * * the information gained in this proceeding convinces us that, on the basis of the record herein, we should not lay down any rules as to what would be necessary or appropriate for consideration in determining the just and reasonable rates of any independent producer subject to our jurisdiction under the Natural Gas Act.

"Accordingly, after full consideration of the suggestions, comments, and recommendations submitted, it appears to the Commission that adoption of any standards, principles, or methods respecting the matters and issues involved herein is not appropriate or necessary in carrying out the provisions of the Natural Gas Act. We so find."

**19.** Cf. for example other regulatory statutes passed prior to or contemporaneously with the Natural Gas Act: The Fair Labor Standards Act of 1938 (Act of June 25, 1938, 52 Stat. 1060, 29 U.S.C.A. §§ 201, 206), extended Federal regulation to conditions of employment "in the production of goods for commerce." The Bituminous Coal Act of 1937 (Act of April 26, 1937, 50 Stat. 72) applied Federal authority to matters directly "affecting" interstate commerce. The National Labor Relations Act (Act of July 5, 1935, 49 Stat. 449, 29 U.S.C.A. § 151), imposed regulation upon matters "affecting" interstate commerce.

**20.** One of Petitioner's briefs concisely traces this history:

As originally introduced, the bill which became the Natural Gas Act defined the scope of the Commission's jurisdiction in these words [H.R. 4008, 75th Cong., 1st sess. (1937) ]:

"The provisions of this Act shall apply to the transportation of natural gas in interstate commerce, to the sale of *such* natural gas for resale to the public, and to natural-gas companies engaged in such transportation or sale * * * " (emphasis supplied).

Similarly, § 2(5) of the original version of the bill contained this definition of "natural-gas company":

" 'Natural-gas company' means a person engaged in the transportation of natural gas in interstate commerce, or the sale of *such* gas for resale to the public" (emphasis supplied).

During hearings, objection was raised to the failure of the bill to "confine jurisdiction to gas sold in interstate commerce." [Hearings before the House Committee on Interstate and Foreign Commerce on H.R. 4008, 75th Cong., 1st sess., pp. 103–105 (1937) ] The objecting witness, Mr. Russell G. Hunt, then offered the following amendment to § 2(5):

" 'Natural-gas company' means a per-

interstate" commerce standard was articulately adopted to determine what "sales" were covered.

And since "commerce among the states is not a technical legal conception, but a practical one, drawn from the course of business," Swift & Co. v. United States, 196 U.S. 375, 398, 25 S.Ct. 276, 280, 49 L.Ed. 518, 525, and "We must accordingly mark the beginning and end of a particular kind of interstate commerce by its own practical considerations," United States v. Yellow Cab Company, 332 U.S. 218, 231, 67 S.Ct. 1560, 1567, 91 L.Ed. 2010, 2020, the test cannot be the simple one of the physical property of gas which keeps it in constant movement from the bottom of the well to the burner tip. " 'Practical continuity' does not always make an act a part of interstate commerce," Southern Pacific Co. v. Gallagher, 306 U.S. 167, at page 177, 59 S.Ct. 389, at page 393, 83 L.Ed. 586, at page 593. This is so since with casinghead gas the sales precede local processing which is essential to extract the valuable economic components of it and to prepare the gas for its interstate

transmission and use as fuel. The processing itself is a local or intrastate activity and can hardly be regarded as being "in" interstate commerce.[21] That the commodity almost certainly, or even inevitably, will be shipped out of the state does not make all of the activity interstate commerce even though it is done in the course of a part of that movement.[22]

In my approach to this matter, I treat these, and the contrary ones urged by the Commission,[23] as aids only. Dealing, as they do, with logs, iron ore, cotton, and the like, they hardly fit the fugitive expansive nature of gas. And, I do not attempt here to assert or explore their final, legal, decisive significance since they may be of "* * * that class of cases [in which] the question is not with respect to the extent of the power of Congress to protect interstate commerce, but whether a particular exercise of state power in view of its nature and operation must be deemed to be in conflict with that paramount authority," Santa Cruz Fruit Packing Company v. N.L.R.B., 303 U.S. 453, at page 466, 58 S.Ct. 656, at page

son engaged in * * * the sale in interstate commerce of such gas for resale to the public."

Without material change, this amended definition, together with a corresponding change in § 1(b), appeared in the bill as favorably reported out by the House Committee, [H.R. 6586 (1937) and H.Rept. No. 709, 75th Cong., 1st sess. (1937)] and in the same form in the Act as passed.

See also Federal Power Commission v. Panhandle Eastern Pipe Line Company, 337 U.S. 498, 512, 513, footnote 16, 69 S.Ct. 1251, 93 L.Ed. 1499, at page 1509.

21. See Crescent Cotton Oil Company v. State of Mississippi, 257 U.S. 129, 42 S.Ct. 42, 66 L.Ed. 166; Parker v. Brown, 317 U.S. 341, 360–361, 63 S.Ct. 307, 87 L.Ed. 315, 331; Federal Compress & Warehouse Co. v. McLean, 291 U.S. 17, 54 S.Ct. 267, 78 L.Ed. 622; Chessaniol v. City of Greenwood, 291 U.S. 584, 54 S.Ct. 541, 78 L.Ed. 1004.

22. See Coe v. Town of Errol, 116 U.S. 517, 525, 6 S.Ct. 475, 29 L.Ed. 715, 718; Superior Oil Co. v. State of Mississippi, 280 U.S. 390, 50 S.Ct. 169, 74 L.Ed.

504; Empresa Siderurgica, S.A. v. County of Merced, 337 U.S. 154, 157, 69 S.Ct. 995, 93 L.Ed. 1276, 1280; Department of Treasury of State of Indiana v. Wood Preserving Corporation, 313 U.S. 62, 61 S.Ct. 885, 85 L.Ed. 1188; Southern Pacific Co. v. Gallagher, 306 U.S. 167, 59 S.Ct. 389, 83 L.Ed. 586; Atlantic Coast Line Railroad Co. v. Standard Oil Company, 275 U.S. 257, 48 S.Ct. 107, 72 L.Ed. 271; Oliver Iron Mining Company v. Lord, 262 U.S. 172, 43 S.Ct. 526, 67 L.Ed. 929; Utah Power & Light Co. v. Pfost, 286 U.S. 165, 52 S.Ct. 548, 76 L.Ed. 1038; Arkadelphia Milling Company v. St. Louis S. W. R. Co., 249 U.S. 134, 39 S.Ct. 237, 63 L.Ed. 517; Crescent Cotton Oil Company v. State of Mississippi, 257 U.S. 129, 42 S.Ct. 42, 66 L.Ed. 166; Heisler v. Thomas Colliery Company, 260 U.S. 245, 259, 260, 43 S. Ct. 83, 67 L.Ed. 237, 243.

23. See, e. g., Shafer v. Farmers' Grain Company, 268 U.S. 189, 45 S.Ct. 481, 69 L.Ed. 909; Lemke v. Farmers' Grain Company, 258 U.S. 50, 42 S.Ct. 244, 66 L.Ed. 458; Dahnke-Walker Milling Co. v. Bondurant, 257 U.S. 282, 42 S.Ct. 106, 66 L.Ed. 239.

660, 82 L.Ed. 954, at page 960. But I do think they offer some relevant assistance in attempting to assay what Congress, familiar generally with legal concepts applied in this field throughout the years, could have had in mind.

But I do think we must recognize that, as in the situation which I analyzed in detail in which the state is deprived of the right to regulate the price of gas, current authoritative decisions also withdraw a substantial part of the gas business and the gas produced from the area of state taxation permitted in so many of these cases cited in notes 22 and 23, supra. In Michigan-Wisconsin Pipe Line Co. v. Calvert, 347 U.S. 157, 74 S.Ct. 396, 98 L.Ed. 583, the Court unanimously held that a Texas tax, applicable on gas at the outlet of an independent gasoline plant as it flows into the lines connecting with an interstate transmission system, violates the Commerce Clause. Of course, on the principle of Panoma to the extent that the jurisdictional sales go to the wellhead or beyond, the movement[24] effected by such sales is in interstate commerce and must likewise be removed from state taxation under Calvert. This means that at least to some extent tax cases are pertinent and in any event, this points up another consequence of a startling kind not shown to have been within Congressional contemplation.

These problems like the question of whether casinghead is "natural gas" and whether the sale is for "resale" or for a manufacturing process and later resale cannot be determined by artificial, mechanical standards, dictionary definitions or, equally unauthoritative, judge-made definitions of some physical or scientific phenomenon.

The Act carefully limits it to the sales for resale of natural gas. It is uncontradicted that what is sold is *something* other than the fuel gas which ultimately goes into the transmission lines. Presumably the purchasers buy this casinghead gas for *all* of its constituent elements. Indeed, in the case of Shell, the contract between it and Phillips began in 1938. It was not until July 1950 that any part of the residue gas sold by Phillips to El Paso Natural Gas. Until 1950 the residue gas was continuously flared. What did Phillips buy during these twelve years? What did Shell sell during these twelve years? What made it change merely because Phillips found a new use or outlet in 1950? Obviously Phillips bought casinghead gas for the valuable liquefiable hydrocarbons (natural gasoline, butane and propane). These are still a major constituent of what they buy. The same is true in the other cases.

If the purchaser buys the gas for its *multiple* use, does not the producer sell for the same purposes. As to casinghead gas, the sale then is for (1) the extraction of valuable liquefiable hydrocarbons, (2) the removal of all valuable hydrocarbons, (3) the processing to eliminate impurities and (4) the sale of the residue to a pipe line company for resale. Now a sale for all four purposes is not a sale for one. And yet the Act itself defines the jurisdictional sale as a "sale in interstate commerce of natural gas for resale for ultimate public consumption" and then categorically states that the Act "shall not apply to *any other* * * * sale* of natural gas."

Does not the very difficulty of attempting to define each of these operations as "processing" or "manufacturing" or analogize gas to a dead chicken, frozen or otherwise, East Texas Motor Freight Lines, Inc., v. Frozen Food Express, 351

24. Calvert puts it in terms of movement, i. e., transportation

"The problem in this case is not whether the State could tax the actual gathering of all gas whether transmitted in interstate commerce or not, cf. Hope Natural Gas Co. v. Hall [274 U.S. 284, 47 S.Ct. 639], 71 L.Ed. 1049, supra, but whether here the State has delayed the incidence of the tax beyond the step where production and processing have ceased and transmission in interstate commerce has begun. * * *" Michigan-Wisconsin Pipe Line Co. v. Calvert, 347 U.S. 157, at pages 166–167, 74 S.Ct. 396, at page 401, 98 L.Ed. 583, at page 592.

If the mechanical-physical movement

U.S. 49, 52, 54, 76 S.Ct. 574, 100 L.Ed. 917, 922–923, 924, and the uncontradicted fact that the sales had a substantial purpose other than ultimately making fuel gas available for transmission and delivery to consumers, suggest further that sales "in interstate commerce for resale" was meant by Congress to be those effected after such processing was completed? Here, as nearly always, the literal[25] test cannot be applied. For "* * * even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' this Court has followed that purpose, rather than the literal words," United States v. American Trucking Associations, 310 U.S. 534, at page 543, 60 S.Ct. 1059, at page 1064, 84 L.Ed. 1345, at page 1350.

I end as I began: could Congress have intended all of these things? Because I think not, I must respectfully dissent.

test is decisive, it is difficult to see why the author and two Associate Justices would so soon dissent in Phillips.

25. For example, the gasoline plant extracts the butane and propane from the natural casinghead gas. This is reduced to a liquid state under pressure and is distributed, as it now is widely, to communities not served by pipe lines. This very same propane, butane is then resold for "ultimate public consumption for domestic, commercial, industrial * * *" and other uses. Since, on the Commission's and Court's chemical-legal standards, it is still natural gas as the

only change is from a gaseous to a liquid state, and there is no change in molecular structure, is the sale by the gasoline plant a sale of "natural gas for resale"? Is the sale by a statewide distributing company to local distributors such a sale? Likewise, suppose Shell sold the *oil* at the wellhead to a purchaser who in turn had sold the casinghead gas to Phillips, who had in turn sold the residue gas to El Paso. Is that original wellhead sale of the oil, carrying inevitably with it the casinghead gas from which all blessings and jurisdiction flow, a sale of natural gas? If not, why not? And if, as the Court holds, the Commission can establish the price which Texas Gas must pay to Deep South where Deep South's volume is but 5% of Texas Gas requirement and its output moves 95% intrastate and 5% interstate, why cannot the Commission fix the price for each barrel of this gas bearing, gas carrying oil?